Filed 4/27/16

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| A.G., | C074211 |
| Plaintiff and Respondent, | (Super. Ct. No. 12 FL03455) |
| v. | |
| C.S., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Peter J. McBrien, Judge. Affirmed.

Family Violence Appellate Project, Erin C. Smith, Nancy Lemon, Jennafer Dorfman Wagner; Morrison & Foerster, Sylvia Rivera, and Hanna Abrams for Defendant and Appellant.

Hughes Law Group and Marc L. Hughes for Plaintiff and Respondent.

C.S. (Mother) appeals from an order awarding sole custody of her children to A.G. (Father). Mother contends the trial court erred by (1) not basing its order on the

1

children's best interests; (2) committing prejudicial evidentiary rulings; (3) denying Mother's request during trial for a continuance to obtain counsel; and (4) committing separate errors that constituted cumulative error.

We disagree with Mother's contentions and affirm the order. As part of our decision, we also conclude the doctrine of implied findings applies in this case where the parties did not request a statement of decision, the court did not prepare one, and the settled statement used by the parties does not contain an express statement by the trial court that it complied with the procedures required for adopting a statement of decision and that the settled statement serves as the court's statement of decision.

FACTS AND CASE HISTORY

This discussion is based on the clerk's transcript and the settled statement Mother submitted in lieu of a reporter's transcript.

1. *Father petitions for custody, and Mother requests a restraining order*

Father and Mother cohabitated from 2004 until May 2012. They have three minor sons: G. (born 2004), A. (born 2006), and I. (born 2008).

On May 17, 2012, Mother and the boys left Father's home and went to a domestic violence shelter in Marin County.

Father petitioned the trial court for sole legal and physical custody of the children. He alleged that Mother, among other things, was unstable, and she had unilaterally removed the children from their school and speech therapy classes.

Mother filed a request for a restraining order against Father under the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.). She alleged Father sexually, emotionally, verbally and mentally abused her and emotionally and mentally abused the children. Specifically, Mother alleged Father has a criminal record, owns a handgun, and is an alcoholic. His smoking in the house caused her son to have asthma attacks. He constantly threatened to throw her out of the house and she would never see her children again. He controlled her and denied her of food. He sexually abused her by forcing her

2

to remove her panties to show she had not had sex with anyone. He photographed her while she was in the shower without her permission. He forced her to make sex videos with him with which he would blackmail her. Father had served prison time for drug possession, and had threatened to take the children away from her and go to Mexico, his home country.

As for physical abuse, Mother alleged Father's girlfriend smashed her arm in a window and pushed her against a wall. Father told Mother not to hit the girlfriend back, or else he would kick her out of the house. Mother also alleged Father physically abused the children with a belt and verbally threatened one of the sons. Father hit two of his sons with a belt for not feeding the pets.

The trial court denied Mother's request for a temporary restraining order, and set the matter for a hearing. The court found Mother did not provide facts that described "in sufficient detail the most recent incidents of abuse, such as what happened, the dates, who did what to whom, or any injuries or history of abuse." However, the court granted mother temporary legal and physical custody of the children, and it denied Father any visitation, although, as noted below, father did participate in supervised visitation at some point. The court later amended its order to include a stay-away order.

2.      *Hearing on long-term restraining order*

The court convened a hearing on August 23, 2012, to determine whether to issue a long-term restraining order. Father was represented by counsel; Mother appeared in propria persona. The court instructed Mother that the hearing was an opportunity for her to provide evidence in support of her request for injunctive relief. Mother stated Father was an alcoholic and had been convicted of driving under the influence. She repeated her allegation that Father was a chronic smoker and his smoking inside the house had caused their son to have an asthma attack.

The court asked Mother to provide evidence of specific acts, not just conclusions. Mother stated she desired a restraining order because Father was "mostly controlling."

3

On Mother's Day 2012, she and the children went to visit her parents, promising Father she would return home by noon. Father subsequently called her that afternoon when she had not returned. He was angry with her. Also, in 2009, there was an incident where Father grabbed her neck with both hands, and the oldest son witnessed the incident. Mother offered no additional testimony of any kind of abuse in support of her allegations.

On cross-examination, Mother admitted knowing that Father had previously been in an accident that injured his shoulder and removed significant muscle tissue from that area. She also admitted being convicted in 2006 of embezzlement, in violation of Penal Code section 503.

Mother's father, E.G., testified in support of Mother. He stated he obtained a separate restraining order against Father due to his and his girlfriend's phone calls and visits when they were looking for the boys after Mother's most recent disappearance. The court stated this evidence was not relevant to determining whether Father had abused Mother.

E.G. testified that when Father and Mother lived together, he often had to drive from his home in San Bruno to Sacramento to pick up Mother and the boys, as Father would not drive Mother to visit her parents. E.G. also discussed the Mother's Day 2012 incident. He had to rush Mother and the boys back to Sacramento. E.G. had no personal knowledge of the way Father treated the boys.

A neighbor of Father and Mother, Alvia Chavez, testified in support of Mother. She stated that in 2007, when she and Mother went to interview for a job, Father called while they were waiting for an interview. The "speakerphone" feature was on, and she heard Father curse at Mother.

On some occasions when Mother would visit Chavez's home, Father would peer though Chavez's window to see if Mother was inside. He would also drive by in front of her home several times to check on Mother, making a u-turn on the street to do so. He would also send one of the sons to look for Mother and tell her to return home.

4

Occasionally, when Chavez drove by Father and Mother's home while Mother was at work, the children were outside barefoot. However, Chavez had never witnessed Father mistreating Mother.

Based on this evidence, the trial court denied Mother's request for injunctive relief. It ruled Mother was unable to establish a specific, credible incident of abuse, and, accordingly, there was insufficient evidence to sustain a domestic violence restraining order.

3.    *Hearing on custody*

On November 8, 2012, the court convened a trial on custody and visitation. The evidence presented a complicated relationship between the parties.

Mother had been married before and had two daughters from that union. In 2003, she agreed her husband could have full custody of their children. At that time, her husband declared Mother suffered from mental instability and had claimed he had molested their daughters. She at one time had allowed their three-year-old daughter to escape into the street unsupervised. Mother did not see her daughters for six years and never introduced them to Father. She claimed she does not speak with her daughters because her ex-husband's new wife does not allow it.

Father was controlling. He would not permit Mother to attend school or to work. Mother testified that in 2009, Father pushed her into a corner during an argument and began strangling her. The couple's oldest son saw the incident. Father, however, had previously been in a motorcycle accident and was missing muscle from the back of his shoulder. He testified that as a result of the accident, he is no longer able to lift one of his arms. Mother acknowledged Father could not lift his right arm above his shoulder due to a motorcycle accident.

Father claimed Mother often let their sons run around in the street while she was on the phone. On June 26, 2010, one son was hit by a car while he was bicycling in the

5

street in front of their home. Mother testified she was watching the children at the time and Father was not present.

In July 2010, Mother left with the children and went to live at her parents' home. Mother would not let Father speak with the children for over a month. He began to see them on weekends beginning in September 2010. Father testified he did not know why Mother left, but Mother testified she left because Father was coming home at 2:00 to 3:00 a.m. and they were fighting often.

In January 2011, Mother asked Father if she and the children could return and live with Father. Father was then in a relationship with another woman, Monica Valerio. However, he allowed Mother to return for six months so she could find a job, get a driver's license, and find an apartment. The two signed an agreement dated January 3, 2011, that stated Father would have sole custody of the children until Mother was financially settled and had her own apartment. Father testified he did not force Mother to sign the agreement, but Mother testified she signed the agreement because Father would not let her live in the house unless she signed it.

By July 2011, Mother had not found herself a job or an apartment. She moved out of Father's house and moved in with her boyfriend two blocks away. The children remained with Father.

About one month later, Mother moved back in with Father. Her boyfriend had told her to leave. By then, Valerio, Father's girlfriend, was living with Father. When Mother moved back in, she agreed to help Valerio with anything that needed to be done in the home, including cooking at night, helping take care of Valerio's children along with her own, and cleaning the house. She agreed to pay attention to the children and not be on the phone all day.

The parties disputed over how well Mother kept her agreement. Valerio testified she and Mother took turns cooking and cleaning, but Valerio did the majority of the work. She woke up the children in the morning to feed them because Mother stayed in

6

bed. Valerio testified Mother was always on her phone and did not watch her children when they were playing outside. Mother also would leave the house without telling Valerio and would leave the children behind.

Father's brother, G.G., also lived in Father's house during 2011 and 2012. His observations of Mother were consistent with Valerio's. Sometimes he would have to feed the children because Mother would sleep late.

Mother disputed Valerio and G.G.'s observations. She denied that she slept in. She and the boys shared a room, and it would have been impossible for her to sleep in when the boys were getting up and preparing for school. Mother and Valerio shared household duties, and she would watch Valerio's children when Valerio was at work or out with Father. Mother denied leaving the children at home without letting Valerio know she was leaving.

The parties disagreed over how Father disciplined the boys. Father claimed he disciplined the boys by putting them in their room or taking a toy away. Valerio claimed Father disciplined the boys by giving them chores; he never hit them. Mother testified Father disciplined the boys by hitting them. She would discipline them by taking a toy away or having them sit in a corner for 10 minutes.

Father did not attend the boys' doctor's appointments or meetings at their school nor did he throw birthday parties for the boys, because, G.G. claimed, Father worked more than one job. Mother was the person who always attended those activities.

Father testified that Mother suffered from mood swings, that she was on prescription medication, and that she may have "mental issues." Mother testified she was not taking antidepressants. She had taken Prozac for a few months in 2003 at the end of her marriage. The court, after observing Mother throughout the proceedings, asked her, "Are you on any medication today? The Court is concerned." Mother replied, "No your Honor. I'm not on medication; I'm just fighting for my boys."

7

On May 13, 2012, Mother's Day, Mother and the children went to her parent's home. Father called her. She answered the phone and became very upset. Father was angry she had not returned.

On May 17, 2012, Mother's sister, Theresa Padilla, picked up Mother and the boys from Father's home and drove them to a domestic violence shelter in Marin County. Father learned that night that Mother and the boys were gone. He telephoned police, but they were of no assistance. He was worried about the boys because Mother had no income and he did not know where they were. He posted flyers in his neighborhood and in Mother's parents' neighborhood in an effort to find them. He repeatedly called Mother's family because of his concern. When Mother's father finally answered the phone, Father asked him if he was concerned about his grandchildren. Grandfather E.G. replied that he was not worried about them. No one ever informed Father that the boys were safe after she left. Mother also did not inform law enforcement or file a "good cause" report with the Marin County District Attorney when she took the children. She went to a shelter in Marin County instead of Sacramento County because it was nice and other shelters were unavailable.

After a break in her testimony, Mother requested a continuance to seek representation. The trial court denied the request, stating she should have made the request before the trial began.

Two other witnesses testified at trial. The first was Stephanie Stilley, a social worker who provided supervision during visits in custody situations. She was present when Father had supervised visits with the children during the time the restraining order was in place. She testified the visits were fine. There was nothing to indicate the children were afraid of Father. They hugged him when they saw him, and he was playful with them.

The second additional witness was Alecia Allison, a Family Court Services mediator. Allison reviewed documents and interviewed Father, Mother, and the children,

8

and reported her findings to the court. Allison searched criminal records, and she found no criminal history for Mother. She found Father was convicted of driving under the influence (Veh. Code, § 23152, subd. (b)) with priors in 1998, and was sentenced to 36 months of probation and 12 months of jail. He was convicted of the same offense in 2010 and was sentenced to three years of probation and two days of jail. His driver's license was suspended or revoked.

Mother told Allison that Father was abusive toward her and the children on many occasions. She claimed she was forced to sign the January 2011 agreement giving custody to Father. She moved in with Father only because he refused to allow her to take the children and threatened that he would take the children to Mexico. Mother alleged Father abused alcohol, as he drank before and after work. She also alleged Father transported the children while he did not have a valid driver's license.

Father told Allison that Mother had a history of leaving with the children without his knowledge or consent. He denied abusing the children except for spanking the oldest child one year earlier. He drank approximately four to five beers three to four days a week. He believed Mother was not financially able to care for the children. He also expressed concern that Mother was not able to ensure the children were safe.

Allison interviewed the two oldest children. Both children said they wanted to be in Mother's care. They feared Father. Father had spanked them, and one disclosed marks after Father spanked him.

Alison also contacted Child Protective Services (CPS). The family was referred to CPS after Mother left with the children in 2012. CPS deemed allegations of emotional abuse by Father inconclusive. The children informed the social worker they feared Father and did not want to see him due to prior incidents of him hitting them. CPS closed the investigation as inconclusive, as the social worker was unable to speak with Father, and the evidence lacked corroboration from any outside agency, such as law enforcement and their records.

9

Based on her investigation, Allison concluded it was in the children's best interest to remain in Mother's primary care, for Father to have supervised visitation, and for the children to participate in counseling. She based her recommendation primarily on the children's expression of fear towards Father and the lack of safety concerns while the children were in Mother's care. Allison made her recommendations "on an interim basis to err on the side of caution with the intent to have the matter reassessed" after the children had participated in counseling.

At trial, Allison stated she reached no conclusion as to whether Father had abused Mother.

4. *Court's ruling on custody*

The trial court adopted the parties' January 2011 agreement giving sole custody to Father as its order, and it ordered Mother to return the children to Father. The settled statement quotes the clerk's minute order from trial, which was signed by the judge, as the trial court's ruling. The quoted order reads in relevant part as follows:

" 'Mother has a history of running away with the children (five times) and most recently May 17, 2012. On 8/23/2012 the Court found insufficient evidence was presented by Respondent Mother to issue a restraining order. Respondent Mother went to Marin County with the children and chose not to disclose location. On January 3, 2011 the parties entered into a written agreement giving custody to Father. The January 3, 2011 stipulation is confirmed as a court order. The parties are referred to the Office of Family Court Services and the matter is continued to January 7, 2013 at 9:00 a.m. for review of the Family Court Services' report.'

" 'The children are to be returned to Sacramento County within 15 days. Mother has taken the children under claim of domestic violence but at trial was unable to prove (those allegations).'

10

" 'Mother has previously been diagnosed as depressed and been prescribed a prescription. Throughout this trial, Mother acted in a very abnormal manner and may be depressed at this time.'

" 'This order affects the children who are to be returned and law enforcement may assist.'

" 'Mother signed up with the "safe home" via the Secretary of State and refused the Court's request for her address.'

" 'Mother Respondent is unwilling to share custody and this fact alone concerns the Court as to Respondent Mother's ability to have custody.' "

Neither party requested, nor did the court prepare, a statement of decision.

5.      *Subsequent investigation and hearing*

Nearly eight weeks after the trial, Family Court Services mediator Allison submitted another report to the trial court. She had interviewed the parties and the children, and she concluded the trial court's order awarding custody to Father "is appropriate as there is no information indicating the children are unsafe while in the care of father despite prior statements made by the children to this writer."

Mother alleged Father was physically abusing the children. She told Allison the children had had bruises or marks on them and she questioned how the injuries occurred. The children were also wearing dirty and tattered clothing.

Mother's allegations of abuse prompted an investigation by CPS. The investigating social worker interviewed the children, and they did not disclose any safety concerns. The social worker also did not observe any. The social worker informed Allison she found no evidence of abuse.

Father told Allison he had allowed Mother to visit the children on weekends despite the lack of a court order on visitation. One weekend, he did not allow contact "after a failed attempt to address inappropriate language/denigrating racial comments the children stated were shared by mother." Father also expressed concern that Mother's

11

mental health concerns had not been addressed.  Allison recommended Mother continue to have parenting time with the children on weekends, and that she and the children participate in counseling with a mental health provider.

At the January 7, 2013, hearing, the trial court adopted Allison's recommendation. The court also asked Mother whether she could transfer her employment and move back to Sacramento.  Mother stated she might be able to transfer if she had more seniority. The court indicated the parties could return to Family Court Services if or when Mother moved back to Sacramento.

6.    *This appeal*

Mother timely appealed from the court's order.  She contends the trial court erred as follows:

1.  The court abused its discretion by not basing its custody decision on the children's best interests.  It did this by (a) failing to consider the mandatory factors listed in Family Code section 3011; (b) improperly penalizing Mother for moving to Marin County in order to escape her abuser; and (c) basing its decision on improper conclusions about Mother's mental state without any evidentiary basis;

2.  The court committed prejudicial evidentiary rulings;

3.  The court abused its discretion when it denied Mother's request for a continuance to obtain counsel; and

4.  The court's separate errors constituted cumulative error that denied Mother a fair hearing.

DISCUSSION

I

*Standard of Review*

Before ruling on the merits, we must determine whether the doctrine of implied findings applies where the parties did not request a statement of decision but rely upon a

12

settled statement. Our determination of that issue establishes the scope of our review. We conclude the doctrine applies.

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. (*Gudelj v. Gudelj* (1953) 41 Cal.2d 202, 208.) The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child. We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked. (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.)" (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.)

" 'A judgment or order of the lower court is *presumed correct.* All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.]" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564, original italics.)

This appeal's record consists of a clerk's transcript and a settled statement in lieu of a reporter's transcript. The parties did not request a statement of decision, and the trial court did not issue one. Generally, "[u]nder the doctrine of 'implied findings,' when parties waive a statement of decision expressly or by not requesting one in a timely manner, appellate courts reviewing the appealed judgment must presume the trial court made all factual findings necessary to support the judgment for which there is substantial evidence. [Citations.]" (*In re Marriage of Condon* (1998) 62 Cal.App.4th 533, 550, fn. 11.)

Some appellate districts have held the doctrine of implied findings does not apply where a statement of decision is waived, a settled statement is used in place of a reporter's transcript, and the settled statement contains the court's decision and the judge's factual and legal basis for the decision. These districts held that in such cases, the doctrine of implied findings will not apply and the reviewing court will not presume the

13

existence of necessary factual findings. (See *In re Marriage of Condon, supra,* 62 Cal.App.4th at p. 550, fn. 11; *In re Marriage of Seaman & Menjou* (1991) 1 Cal.App.4th 1489, 1494, fn. 3; *In re Marriage of Fingert* (1990) 221 Cal.App.3d 1575, 1580.)

Another appellate district has joined with legal commentators to refuse to acknowledge an exception to the implied findings doctrine when the parties do not request a statement of decision. In *In re Marriage of McHugh* (2014) 231 Cal.App.4th 1238, the Court of Appeal wrote: "[A]lthough the foregoing cases seek to create an exception to the implied findings doctrine, several respected treatises explain, 'The apparent consensus is that appellant's express or implied waiver of a statement of decision on the appealed issues *unequivocally* invokes the doctrine of "implied findings." ' (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2014) ¶ 15:103, pp. 15-23 to 15-24 (rev. # 1, 2012), original italics; see Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2014) ¶ 8:24, pp. 8-13 to 8-14; Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2014) ¶ 9:267, pp. 9-73 to 9-74.) We therefore follow the general rule and apply the implied findings doctrine." (*In re Marriage of McHugh, supra,* 231 Cal.App.4th at p. 1249, original italics.)

We, too, follow the general rule, and conclude the use of a settled statement in lieu of a reporter's transcript does not negate the doctrine of implied findings where the parties waived a statement of decision. A settled statement is "a condensed narrative of the oral proceedings that the appellant believes are necessary for the appeal." (Cal. Rules of Court, rule 8.137(b)(1).) As a summarized narrative of what was *said*, a settled statement may not capture the judge's complete analysis of an issue of fact or law, even if the judge ruled from the bench. Here, the part of the settled statement Mother claims contains the court's factual and legal basis for its ruling is actually a quotation from the trial minute order likely prepared by the court clerk and signed by the judge. It is not a copy of the trial court's final, written presentation of its factual and legal reasoning.

14

A statement of decision, on the other hand, provides a complete record of the court's reasoning. It goes beyond memorializing only a condensed narrative of the oral proceedings. "The purpose of the statement is to provide an explanation of the factual and legal basis for the court's decision." (*Onofrio v. Rice* (1997) 55 Cal.App.4th 413, 425.) A statement of decision gives the trial court "an opportunity to place upon [the] record, in definite written form, its view of the facts and the law of the case, and *to make the case easily reviewable on appeal by exhibiting the exact grounds upon which judgment rests*." (*Whittington v. McKinney* (1991) 234 Cal.App.3d 123, 127, some original italics, some added italics.) "If a statement of decision is given, it provides us with the trial court's reasoning on disputed issues and 'is our touchstone to determine whether or not the trial court's decision is supported by the facts and the law.' (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718.)" (*In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 287.)

"[A] statement of decision is a formal legal document containing the factual and legal basis for the court's decision on each principal controverted issue for which a statement is requested. Because of the significant legal effect of a statement of decision, Code of Civil Procedure section 632 and California Rules of Court, rule [3.1590], provide a highly detailed process by which counsel for the litigants can provide input into and affect the final content and language of the statement of decision, so that the appellate court has before it the factual and legal basis for the trial court's determination of the issues being reviewed on appeal." (*In re Marriage of Buser* (1987) 190 Cal.App.3d 639, 642-643.)

As a "condensed narrative of the oral proceedings," a settled statement does not guarantee the reviewing court has before it the factual and legal basis for the trial court's determination. Even if we could conceive of an exception where the trial court expressly states in the settled statement that it has complied with procedures required for adopting a statement of decision and the settled statement serves as the court's statement of decision,

15

the settled statement here does not contain such a judicial guarantee. It includes a brief description of the oral testimony received over the two hearings. It then contains, in effect, a copy of the court clerk's minute order as signed by the judge. There is no certification that what appears as the court's order is the court's complete factual and legal basis supporting its decision on each principal controverted issue for which a statement may have been requested and is before us on appeal. Given this omission and consequent uncertainty, we are not at liberty to ignore the doctrine of implied findings and reverse the trial court on factual and legal grounds it may have actually considered but not expressed in writing. We thus apply the doctrine of implied findings as we review the trial court's decision.

## II

### *Custody*

Mother contends the trial court abused its discretion by not basing its custody decision on the children's best interests. Specifically, Mother claims the court erred by (a) failing to consider the mandatory factors listed in Family Code section 3011; (b) improperly penalizing Mother for moving to the Marin County shelter and not moving back to Sacramento County; and (c) basing its decision on its conclusion that Mother may have been depressed during trial. We conclude the trial court did not abuse its discretion.

A. *Section 3011 factors*

"In an initial custody determination, the trial court has 'the widest discretion to choose a parenting plan that is in the best interest of the child.' (Fam. Code, § 3040, subd. (b).) It must look to *all the circumstances* bearing on the best interest of the minor child. (*Burchard v. Garay* (1986) 42 Cal.3d 531, 534.) Family Code section 3011 lists specific factors, 'among others,' that the trial court must consider in determining the 'best interest' of the child in a proceeding to determine custody and visitation: '(a) The health, safety, and welfare of the child. [¶] (b) Any history of abuse by one parent [against any

16

child of the parent; the other parent; or a parent, current spouse, or cohabitant, of the parent seeking custody]. [¶] (c) The nature and amount of contact with both parents . . . . [[¶] and (d) The habitual or continual illegal use of controlled substances, the habitual or continual abuse of alcohol, or the habitual or continual abuse of prescribed controlled substances by either parent.]' " (*In re Marriage of Burgess, supra,* 13 Cal.4th at pp. 31-32, original italics.)

Mother asserts the trial court did not consider (1) Father's history of alcohol abuse; (2) Father's physical abuse of the children; (3) that a restraining order was issued to protect Mother's parents from Father; and (4) the nature and amount of contact the children had with both parents. We conclude the court considered these factors, and to the extent its findings were not express, we imply them, as substantial evidence in the record supports them.

### 1. *Allegations of alcohol abuse*

The court considered Father's alleged history of alcohol abuse. Family Court Services mediator Allison testified Father had received two convictions for driving under the influence, one in 1998, the other in 2010. Father testified he drank approximately four to five beers three to four days a week. There was no expert witness testimony concerning Father's use of alcohol and whether it constituted "habitual or continual abuse of alcohol." (Fam. Code, § 3011, subd. (d).) The court did not seek corroborating evidence, and Mother did not introduce any. This evidence supports the court's implied finding that it considered father's history of alcohol use.

Family Code section 3011, subdivision (e)(1), requires a court, when it awards sole or joint custody to a parent against whom allegations of abuse or habitual abuse of alcohol have been brought to the court's attention, to "state its reasons in writing or on the record" for its custody award. Mother contends this directive applied because of her allegations, and the trial court did not fulfill this requirement. We have already concluded the court did not prepare a statement of decision, and the settled statement is

17

not the equivalent of a statement of decision. Family Code section 3011 required the court to set forth a statement of reasons, but a statement of reasons is also not the equivalent of a statement of decision. (See *In re Marriage of Buser, supra,* 190 Cal.App.3d at p. 642.) On this record, and for purposes of the Family Code section 3011 requirement only, the settled statement adequately set forth the court's reasons for granting father sole custody. The court found there was no evidence of abuse by Father, Mother had a history of running away, Mother refused to share custody with Father, and Mother appeared to be mentally unstable. Nothing in Family Code section 3011 defines what the court's statement of reasons must contain except that it include the court's reasons for the custody award in light of allegations of alcohol abuse. The settled statement fulfills this requirement.

### 2. *Allegations Father physically abused the children*

The court also considered Father's alleged abuse of the children. "[I]n the context of a child custody proceeding when allegations of child abuse or neglect arise, before making a custody determination the court necessarily must determine the veracity of such allegations to ensure the court is acting in the 'best interest' of the child. ([Fam. Code,] § 3011, subd. (b)(1)–(3).)" (*Robert J. v. Catherine D.* (2009) 171 Cal.App.4th 1500, 1514-1515.) Here, in a separate hearing, the trial court determined the allegations had not been proven. The court provided Mother an opportunity to introduce all of her evidence of alleged abuse against herself and the children. Except for stating conclusory accusations, Mother did not introduce any evidence Father abused the children. At trial on custody, there was evidence the boys feared Father because he spanked them. However, government investigators could not find any evidence supporting the accusations. A social worker found no evidence of abuse. Substantial evidence thus supports the trial court's implied finding that it considered the allegations of abuse against the children and found them wanting.

18

### 3. *Restraining order*

The court considered a restraining order had been issued against Father to protect Mother's parents. The court stated it was not relevant for determining whether Father had abused Mother. Nonetheless, it was relevant for determining the best interests of the children. Substantial evidence supported the court's not placing great weight on the point, as there was no evidence Father ever abused either of Mother's parents or that he violated the restraining order. He pestered them with phone calls once Mother left with the children because they refused to disclose where his children were.

### 4. *Contact with parents*

Finally, the court considered the nature and amount of contact the children had with each parent. Both parents raised the children until 2010, when Mother left and took the children with her to her parents' home. Mother returned in 2011 and agreed to Father having sole custody of the children. Later that year, Mother left again, this time without her children, to live with her boyfriend. She returned after the boyfriend forced her out. She and Valerio took care of the children while Father worked to provide for the household. Mother left again in May 2012 and took the children with her to the Marin County shelter without disclosing to Father the children's location or condition. It is obvious the trial court considered this history of the parents' contact with the children, as it specifically mentioned in the settled statement Mother's history of leaving Father as one of the grounds for its custody order.

We find the trial court considered all of the factors mandated by Family Code section 3011 when it granted custody to Father.

### B. *Effect of Mother's move to Marin County*

Mother contends the trial court abused its discretion to the extent it denied Mother custody because it was attempting to coerce Mother to move back to Sacramento County. We see no basis to suggest the court was "attempting to coerce [Mother] to move back to

Sacramento County." The court's interest was to determine the best interest of the children, and the court could reasonably believe the distance between the two parents' homes was a factor worth considering. The court could also reasonably consider that Mother left Father and, with the children, went to a shelter in a distant county without disclosing their location. One of the factors the court had to consider was which parent was more likely to allow the children to have frequent and continuing contact with the noncustodial parent. (Fam. Code, § 2040, subd. (a)(1).) Mother's actions and history of leaving Father, where the court found insufficient evidence of abuse, were points to consider in determining the children's best interest. These points had nothing to do with any perceived attempt to coerce Mother to return to Sacramento. They had much to do with determining which parent should have primary custody.

C.    *Mother's mental state*

Mother contends the trial court's speculation that she may have been depressed was an insufficient basis for denying her custody. "[I]t is the policy of this state that the existence of a disability does not permit a court to presume detriment." (*In re Marriage of Heath* (2004) 122 Cal.App.4th 444, 450.) Mother contends the trial court has wrongfully presumed the children's best interests are not met by being with her due to her possible depression, a presumption made without any expert testimony as to Mother's actual condition or its affect on the children.

We do not dispute that the mere suggestion, or even diagnosis of depression, without more, is an improper ground on which to base a custody order. Here, Mother admitted she had been diagnosed with depression and prescribed a medication in 2003, but she had not taken the medication since then. Father asserted Mother suffered from mood swings and alleged she had "mental issues." These facts, standing alone, are an insufficient ground on which to deny Mother custody. They did not connect Mother's mental illness with an inability to care for the children adequately.

20

However, the court's finding on this point was not made in a vacuum. In addition to considering the evidence just mentioned, the court witnessed Mother as a pro per party throughout the hearings, and the court saw something that disturbed it. The court asked Mother, "Are you on any medication today? The Court is concerned." In the settled statement, the court noted, "Throughout this trial, Mother acted in a very abnormal manner and may be depressed at this time." The court made no medical diagnosis, but it saw Mother act and behave in a manner that left the court questioning her ability to share custody. The court was entitled to rely on this evidence, along with all the other evidence before it, to award custody to Father. Substantial evidence supports the trial court's findings, express and implied, awarding custody to Father.

III

*Evidentiary Rulings*

Mother contends various evidentiary rulings by the trial court denied her a fair hearing. Specifically, she claims the court erred when it (1) excluded testimony by Mother's neighbor, Alvia Chavez, that Mother appeared at her home in 2009 and told her Father had just attempted to strangler her; (2) overruled Mother's objection to Father's testimony that Mother was on the phone when their child was hit while riding his bike in the street; and (3) refused to assist Mother, who appeared in propria persona, to develop the facts and elicit testimony. We disagree.

A.    *Refusal to assist Mother*

We take up the latter assertion first. Mother faults the trial court for not assisting her in eliciting oral testimony from her sister, Theresa Padilla. Padilla had prepared a written statement, but the trial court did not allow her to read it, ruling all testimony must be in the form of a question and answer. Mother contends the court should have helped her elicit the testimony. She cites *Gamet v. Blanchard* (2001) 91 Cal.App.4th 1276, 1284 (*Gamet*) to assert trial courts have "the responsibility to ensure that when one party is represented by counsel and the other is not, the playing field is level."

21

Mother overstates *Gamet*'s holding. What the appellate court actually wrote was: "We further note that in propria persona litigants are not entitled to special exemptions from the California Rules of Court or Code of Civil Procedure. [Citation.] They are, however, entitled to treatment equal to that of a represented party. Trial judges must acknowledge that in propria persona litigants often do not have an attorney's level of knowledge about the legal system and are more prone to misunderstanding the court's requirements. When all parties are represented, the judge can depend on the adversary system to keep everyone on the straight and narrow. When one party is represented and the other is not, the lawyer, in his or her own client's interests, does not wish to educate the in propria persona litigant. The judge should monitor to ensure the in propria persona litigant is not inadvertently misled, either by the represented party or by the court. While attorneys and judges commonly speak (and often write) in legal shorthand, when an in propria persona litigant is involved, special care should be used to make sure that verbal instructions given in court and written notices are clear and understandable by a layperson. *This* is the essence of equal and fair treatment, and it is not only important to serve the ends of justice, but to maintain public confidence in the judicial system." (*Gamet, supra,* 91 Cal.App.4th at p. 1284, italics added.)

The trial court was under no obligation to "level the playing field" by assisting Mother to elicit testimony. "We recognize the fact that [Mother] is appearing without the benefit of legal counsel. However, we are unable to ignore rules of procedure just because we are aware of that fact. 'When a litigant is appearing in propria persona, [she] is entitled to the same, but no greater, consideration than other litigants and attorneys [citations]. Further, the in propria persona litigant is held to the same restrictive rules of procedure as an attorney [citation].' [Citations.]" (*County of Orange v. Smith* (2005) 132 Cal.App.4th 1434, 1444.) There is no evidence Mother received less consideration than Father or Father's attorney during the hearings.

22

B.    *Specific evidentiary rulings*

Holding Mother to the same standards of performance as we would an attorney, we turn to her substantive objections. She claims the court committed two evidentiary errors. First, she asserts the court erred at the restraining order hearing when it excluded testimony by neighbor Chavez that Mother appeared at her home in 2009 and told her Father had just attempted to strangler her. Father objected to this testimony. The court asked Mother if she wanted to be heard concerning the objection. Mother said, "No." The court then sustained the objection.

Before us, Mother contends Chavez's testimony was admissible over a hearsay objection as either a prior consistent statement (Evid. Code, §§ 791, subd. (b), 1236), or as an excited utterance (Evid. Code, § 1240).

Second, Mother asserts the trial court erred when it overruled her objection to part of Father's testimony. Father testified that Mother often let the children run around in the street while she was on the phone. He testified that one of his sons was hit by a car while bicycling in the street in front of their home. Mother interrupted Father, stating that at the time she was sweeping the driveway and watching the boys, and Father was at work and not present when the incident occurred. The trial court instructed Mother that she could provide her additional testimony on this subject later if she desired to.

Mother argues the trial court erred, and it should have sustained Mother's "objection" on the ground that Father's testimony lacked foundation.

Mother, however, did not raise at trial the arguments against the court's evidentiary rulings that she raises here. Because Mother did not raise those arguments at trial, she has forfeited the right to raise them on appeal. " '[A] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct' (*People v. Partida* [(2005)] 37 Cal.4th 428, 435) . . . ." (*People v. Thornton* (2007) 41 Cal.4th 391, 443 [defendant forfeited arguments challenging trial court's exclusion of hearsay evidence where he failed to raise them at trial in opposition to plaintiff's objections].)

## IV

### *Continuance*

Mother contends the trial court abused its discretion when it denied her request for a midtrial continuance in order to obtain counsel. She contends the court's denial of the continuance, in light of the fact she was in propria persona, denied her a fair hearing. We disagree.

If Mother had wanted to hire counsel, she had sufficient time to do so prior to the hearing. She had 52 days–almost two months–to obtain counsel from the time the hearing was noticed until it was held. Instead, she waited not just until the day of the hearing, but until Father had already presented three witnesses and she had finished her own testimony before seeking a continuance to find counsel. Under these circumstances, we cannot say the trial court abused its discretion when it denied the request.

## V

### *Cumulative Error*

Mother contends the cumulative effect of the court's alleged errors combined to deny her a fair hearing. Because we have found no error, and certainly no prejudicial error, we find no cumulative error. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1030.)

### DISPOSITION

The trial court's order after hearing, filed February 21, 2013, is affirmed. Costs on appeal are awarded to Father. (Cal. Rules of Court, rule 8.278(a).)

                                          NICHOLSON          , Acting P. J.

We concur:


      MAURO          , J.


      HOCH          , J.

24