**Electronically Filed
Supreme Court
SCWC-17-0000027
13-APR-2020
08:12 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

DJ, Respondent/Plaintiff-Appellant,

vs.

CJ, Petitioner/Defendant-Appellee.

_____

SCWC-17-0000027

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000027; FC-D. NO. 12-1-6689)

APRIL 13, 2020

McKENNA, POLLACK, AND WILSON, JJ., WITH NAKAYAMA, J.,
CONCURRING AND DISSENTING, WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

In their 2012 divorce, CJ (Mother) and DJ (Father) were granted joint legal and physical custody of their two minor children.  In 2016, Mother filed a motion for post-decree relief in the Family Court of the First Circuit ("family court"), requesting sole physical custody and joint legal custody, so

that she could relocate from Hawai'i to North Carolina with the children and their soon-to-be-stepfather.

More than six months after Mother filed her motion for post-decree relief, the family court held a half-day trial on the motion. One week before the trial, a social worker in the family court's Custody Investigations Unit ("CIU") completed a custody evaluation investigation and report ("CIU Report" or "Report"). It is unclear when the parties received the Report.

Both Mother and Father proceeded to trial without attorneys. Father, who had a Tagalog interpreter available at trial, experienced difficulty cross-examining several witnesses. When the family court indicated it was calling the CIU social worker as a witness, Father orally requested a continuance so that he could obtain the assistance of an attorney. The family court denied Father's oral motion as untimely, then ruled that it was in the children's best interests to relocate with Mother.

On appeal, Father argued that the family court abused its discretion in: (1) denying his motion for a continuance at trial, and (2) considering the CIU Report in granting Mother's motion for post-decree relief. The Intermediate Court of Appeals ("ICA") majority vacated the family court's ruling, holding that the family court abused its discretion in denying Father's motion for a continuance to seek an attorney. The

2

majority did not address whether the family court abused its discretion in considering the CIU Report.

Mother's application for writ of certiorari presents two questions: (1) whether the ICA erred in holding that the family court abused its discretion in denying Father's motion for a continuance at trial; and (2) if so, whether the family court abused its discretion in considering the CIU Report in ruling upon Mother's motion for post-decree relief.

The main populated Hawaiian Islands are some of the most remote populated land masses in the world, located about 2,400 miles from California and 4,000 miles from Japan. When a child relocates out-of-state with the other parent, even if a court order allows for visitation during summer or winter vacations, travel expenses make regular continued contact with the child quite difficult, if not impossible, for the great majority of Hawai'i parents. A proposed out-of-state relocation with a child can therefore significantly affect a parent's substantive liberty interest in the care, custody, and control of a child. Whether or not to allow relocation, however, must be based on a determination of the child's best interests, which includes a child's right to parental contact.

Based upon the important interests involved, for the reasons discussed below, the ICA majority did not err by holding

that the family court abused its discretion in denying Father's request for a continuance to seek the assistance of an attorney. Father not only had English language difficulties, but was not able to effectively exercise his statutory right to cross-examine the CIU social worker on the detailed CIU Report, which had been prepared only one week before trial, and may not have been received by Father until the day of trial.

On the other hand, with respect to the second question on certiorari, the family court did not abuse its discretion in considering the CIU Report. Family courts should consider CIU or any other available family court social worker reports in making these difficult decisions regarding whether or not to allow relocation. Family courts also have the discretion to appoint guardians ad litem for children in relocation cases pursuant to HRS § 571-46(a)(8) (2006 & Supp. 2013).

In summary, we affirm the ICA's February 8, 2018 Amended Judgment on Appeal remanding this case to the family court for further proceedings. The family court is to conduct further proceedings consistent with this opinion.

## II. Background

### A. Factual background and prior divorce proceedings

Father and Mother were both born in the Philippines. Father moved to Hawai'i in 1997. Father met Mother in the

4

Philippines in 2007 while vacationing there, and Mother became pregnant. After Father returned to Hawai'i, he petitioned for Mother to come as his fiancée. Mother gave birth to their son in the Philippines in February 2008 ("Son"), then moved to Hawai'i in 2009. Father and Mother were married in May 2009, and they had another child, a daughter, born in January 2012 ("Daughter").

Several weeks after Daughter's birth, Mother and Daughter traveled to the Philippines for Daughter's baptism. Father arrived later. Due to marital issues, Father returned to Hawai'i alone in March 2012 to return to work, and Mother and Daughter returned in April.

Through an attorney, Father filed for divorce on May 11, 2012. At the time, he was employed as a housekeeper at the Sheraton Waikīkī Hotel. Mother was employed as a certified nurse's aide at a Hawai'i Kai retirement community and as a cashier at Times Supermarket in Kaimukī.

Sometime thereafter, Mother moved into the Pauoa home of a married couple to serve as caretaker for the wife's mother. The wife, L.C., worked as a legal assistant and the husband, M.C., was a retired Honolulu Police Department Lieutenant.

At a hearing on August 22, 2012, Father and Mother, through their attorneys, placed their agreements regarding divorce terms

on the record. With respect to the children, Father and Mother agreed to joint legal and joint physical custody. They also orally agreed that neither party could leave Hawai'i with the children without written consent of the parties or a court order. The October 25, 2012 Decree Granting Absolute Divorce and Awarding Child Custody ("Divorce Decree") reflected the agreement for joint legal and physical custody. With respect to removal of the children from Hawai'i, the Divorce Decree provided, "The parties shall provide the other party sixty (60) days written notice prior to removing the minor children outside the City and County of Honolulu or relocating the minor children to another state. If the other party consents then that party shall provide written approval allowing the removal of the minor children."

By the date of the October 25, 2012 Divorce Decree, Mother had met a nurse at Tripler Army Medical Center, with whom she entered into a relationship ("Boyfriend," "Fiancé," or "Stepfather"). After Boyfriend's discharge from the Army, he relocated to Durham, North Carolina. He and Mother were married there in April 2016.

After the Divorce Decree, Father filed a pro se motion on March 14, 2013, requesting that child exchanges occur at a police station. This motion was orally denied at a hearing on

June 19, 2013.  On June 28, 2013, Mother filed a motion requesting that the court authorize Boyfriend and the couple with whom she lived to conduct child exchanges with Father when Mother was working and to order Father to communicate with her regarding Son's immigration application.  This motion was granted over Father's opposition.

More than two years later, on November 10, 2015, Father filed a motion regarding the children's doctors and medical and immigration expenses, which the parties resolved at the December 16, 2015 hearing, with Mother represented by counsel; as part of this order, Father and Mother both agreed to attend parenting counseling.

Although Father had been represented by an attorney in the divorce, in the post-divorce hearings, he appeared pro se each time.

B.   **Subject custody/relocation proceedings**

On February 1, 2016, Mother filed a motion for post-decree relief requesting that she be granted sole physical custody of Son and Daughter, then about eight and four years old, subject to Father's reasonable visitation rights.  Mother's motion asserted that a change in custody was appropriate because she was "planning on relocating to another state and believe[d] that it [was] in the children's best interest to reside with her."

In her declaration, Mother explained that she intended to relocate to Durham, North Carolina with her children, where she would live with Boyfriend, who was by then her Fiancé, and her parents (the children's maternal grandparents). Mother explained that Fiancé had already relocated to North Carolina to start a new career, and had secured temporary housing for himself, Mother, the children, and Mother's parents.

Mother advanced several reasons as to why she believed that the children's relocation to Durham was in their best interests. She averred that the intended neighborhood of relocation was safe, and that the area provided the children with opportunities to attend top-rated elementary schools and participate in excellent extracurricular activities. Additionally, Mother stated that her parents and Fiancé's extended family, who also lived in the Durham area, would be able to help raise the children and support Mother. Lastly, Mother contended that Father had been inconsistent in caring for the children, that he did not place the children's needs first, and that if the children were not permitted to relocate with her, Father would "continue to alienate [Mother] and cut off or minimize any contact" that she would be able to have with her children. Mother asserted that if the children were allowed to relocate with her, she would ensure they maintained a relationship with

8

Father by having regular contact with him, and by allowing them to visit Father during their school breaks.

Proceeding pro se, Father filed a response to Mother's motion for post-decree relief on February 18, 2016. Father argued that relocation to Durham would not be in the children's best interests because (1) Mother's relationship status and living situation in Durham would be unstable, as Fiancé could leave her at any time; (2) Father did not trust that Fiancé would care for his children and that they would be safe in his care; and (3) the children already had an established network of family support in Hawai'i, where they had developed positive relationships with their paternal cousins and aunt. Father also asserted that Mother did not have proper parenting skills, and that she had raised the children with improper morals by encouraging them to damage Father's property and to misbehave towards others.

The family court[1] held an initial hearing on Mother's motion for post-decree relief on March 16, 2016. Mother was represented by two attorneys, and Father appeared pro se. Mother's counsel clarified that she only sought sole physical

---

[1] The Honorable Lanson K. Kupau presided over the hearings held on March 16, 2016; March 30, 2016; and June 8, 2016.

custody, and was not seeking to set aside joint legal custody. At the hearing, the family court stated it was unable to determine whether relocation to Durham was in the children's best interests based on the information in the file, and opined that a custody evaluator or fact finder would be able to provide the family court with information to render an informed decision. The parties then agreed to the appointment of a custody evaluator or fact finder, and they agreed to split the costs.

When the family court tried to ascertain whether the parties preferred a custody evaluator or a fact finder and who the parties wanted to serve in either capacity, Father requested the assistance of a Tagalog interpreter to ensure that he could make an informed decision. In light of Father's request for an interpreter, the family court continued the hearing on Mother's motion for post-decree relief to March 30, 2016.

On March 22, 2016, Father filed a second response to Mother's motion for post-decree relief, stating he no longer desired to split the costs of a custody evaluator. He asserted that an investigation was not necessary, and that if Mother wanted an investigation, she should bear the costs. He also expressed his opinion that Mother's request was a waste of time and that it should be dismissed.

10

At a further hearing on March 30, 2016, Mother was represented by counsel, Father was again pro se, and a Tagalog interpreter was present for Father.  At the hearing, Father reiterated that he did not want to bear the costs of a fact finder.  After some discussion, the parties ultimately agreed to the appointment of a fact finder and that Mother would pay for his services.  The family court ordered that the hearing on Mother's motion for post-decree relief be continued to July 6, 2016 to afford the parties a sufficient opportunity to receive and review the fact finder's report and resolve the matter.

On May 25, 2016, however, Mother, now also proceeding pro se, filed an ex parte motion and declaration to advance the hearing on her motion for post-decree relief.  Mother requested that the hearing be advanced because she decided not to proceed with a fact finder because the fees were much greater than she had anticipated and she needed that money to enroll Son in a private school in North Carolina to assist in his academic adjustment.  The family court[2] approved Mother's motion to advance and scheduled a hearing for June 8, 2016.

---

[2]     The Honorable Matthew J. Viola granted Mother's ex parte motion to advance the hearing on her motion for post-decree relief.

11

On June 8, 2016, Father and Mother both appeared pro se. A Tagalog interpreter again appeared to assist Father. Mother reiterated that she did not want to proceed with a fact finder because the expenses were more than she had anticipated and that she believed the money should be used to enroll Son in a private school. The family court determined that it was unable to rule upon Mother's motion for post-decree relief and ordered that the case be set for trial on July 8, 2016. Specifically, the following exchange took place:

> THE COURT: Because you guys have changed basically what you had agreed to do, and -- which is fine. I mean, I understand your -- your situation. But I'm unable to have the hearing today.
> So what I'm going to do is you guys are going to have to go to trial on July 8th, 2016, at 8:30 in the morning.
>
> . . . .
>
> [Y]ou guys have to . . . come back here for trial on July 8th at 8:30.
> All witness and exhibit lists need to be filed and exchanged with the parties by July 1st, 2016.
> And then we'll -- I'll give you a half-day trial, from 8:30 to 12 o'clock, to present whatever witnesses you have and evidence you have to either support your request to relocate or to challenge the request to relocate. Okay?
> Do you guys understand that?
>
> . . . .
>
> [MOTHER]: Actually, I actually prepared the exhibits, but then if you want to (indiscernible) for the trial, then --
> THE COURT: Because I -- I want you guys to have more time than you guys are going to have just in a -- a short hearing today, 'cause this is a very important request. So I'm going to set it for trial and give you half a day, just you guys, to present your case so that I can have more time to go and consider everything. Okay?
> Okay. Any questions, sir?
>
> [FATHER]: No, Your Honor.

12

> THE COURT:  And then [an] interpreter will be ordered for
> that day.

On June 8, 2016, the family court also ordered the parties to appear before a family court officer on June 20, 2016 for a quick custody study, to exchange and submit all witness lists and exhibits by July 1, 2016, and then set an "extended hearing" for July 8, 2016 at 8:30 a.m.[3]  On June 14, 2016, however, the family court set aside its June 8, 2016 order and instead referred the parties to the family court's Custody Investigation Unit for a regular custody investigation.[4]  The parties were also ordered to appear for "an extended hearing" on Mother's motion for post-decree relief and "for the Return on [CIU] investigation" on September 30, 2016.

On September 22, 2016, Father submitted a detailed, notarized letter addressed to Judge Kupau, who had been presiding over Mother's post-decree motion, expressing serious concerns with what he perceived to be the antagonistic attitude toward him by the CIU social worker who had come to conduct the

---

[3]   The family court referred to this as a "trial" during the hearing, but the order used the term "extended hearing."

[4]   This investigation differs from the quick custody study previously ordered, which does not involve site visits and interviews with various other persons that may be able to provide information pertinent to a custody report.

13

home visit, and also expressing why he thought the children should not be relocated to North Carolina. It appears the CIU social worker completed the twenty-eight page, single-spaced CIU Report on or about September 23, 2016. The record does not reflect the mailing of the CIU Report to the parties.[5]

On September 30, 2016, the parties appeared before the family court.[6] At the outset, the family court indicated that "this hearing, this trial" would have to be completed by noon. The proceedings began at 8:34 a.m. and concluded at 11:44 a.m., with one fourteen minute recess. Both Mother and Father proceeded pro se, and a Tagalog interpreter was present to assist Father.

Before opening statements, the family court asked Mother and Father to clarify the identities of their witnesses and testimonies they expected from each. Mother first indicated she was going to call M.C. and L.C. to testify regarding their past

---

[5]    In contrast, the minutes reflect that a court clerk mailed the June 13, 2016 order, which was not entered at the end of a court proceeding, to the parties. The CIU Report itself is sealed due to its confidentiality pursuant to HRS § 571-84(c) (Supp. 2001), which provides that "[n]o information obtained or social records prepared in the discharge of official duty by an employee of the court shall be disclosed directly or indirectly to anyone other than the judge or others entitled under this chapter to receive the information, unless and until otherwise ordered by the judge."

[6]    The Honorable William J. Nagle presided over the trial and the motion for reconsideration.

14

encounters with Father, their relationship with the children, their impressions of Mother's husband, and why they believed it was in the children's best interests to move to North Carolina. The family court indicated that Mother could only call either M.C. or L.C. as a witness. Mother also stated she would also be calling her mother as a witness to testify regarding the Son and Father in the Philippines, Father's behavior when picking up Son, and the help she would provide when moving to North Carolina. The family court then stated that what happened in the Philippines was not relevant to the trial issue of whether Mother should be granted sole legal[7] and physical custody of the children and the "other issue . . . [of] whether [Mother] should be allowed to relocate with the children to North Carolina."

Father next explained he had brought his sister, his father, and a family friend to testify on his behalf and the natures of their expected testimonies. Regarding the proposed testimony of the sister and the father, the family court indicated that Father would only be able to call one of them to testify about the caretaking of the children because their testimony would be cumulative.

---

[7]     Mother had not requested a change in Father's joint legal custody.

The family court also stated that "the fact that [Mother and Father had] listed witnesses to testify in addition to [themselves] is going to put a strain on our ability to get this done this morning[,]" and indicated that if the parties were going to call witnesses other than themselves, they needed to get to the point. The family court additionally indicated it was not interested in parties' "past disputes and quarrels" as it had reviewed the court file. The family court then advised the parties that "if you're going to call people, get to the point. And if you're going to cross-examine people, ask your questions. Be sure you know what you're asking, and don't get into arguments in front of the Court."

The family court also acknowledged that both parties had submitted numerous exhibits to be received into evidence and addressed which ones were going to be admitted. The family court then asked if either party wanted to make an opening statement.

Father's opening statement consisted of the following:

> [FATHER]: Your Honor -- (Through interpreter) -- it's this -- this (indiscernible). It's very hurting to me to -- seeing as my children were still young. It's been seven years that they've been out from me. So they remove her – [Daughter] (indiscernible). It's -- it really hurts me. It's your decision. It's up to you, Your Honor, if you -- if you allow them to be removed away from me, although it hurts me very much. I -- I wish that they could stay with me, because I love them very much. They are my life. So (indiscernible) they did to me, I am a U.S. citizen. I also stay with my parents. It is up to you, Judge. It's your decision. Please don't allow them to be removed from me.

16

(In English) That's all, Your Honor.

(Through interpreter) That's all I can say.

Mother then presented a much more lengthy opening statement in English.  She stated she was not seeking to change Father's joint legal custody of the children.

Mother then called three witnesses to testify on her behalf:  (1) L.C., the friend with whom she had resided, for whose mother she had served as caretaker; (2) the children's maternal grandmother; and (3) M.C., the retired HPD Lieutenant, with whom Mother also resided.  Although the family court had indicated earlier that Mother could only call either L.C. or M.C. as a witness, at the conclusion of the grandmother's testimony, the family court asked Mother if she wanted to call M.C., who was then also allowed to testify.  Mother also testified on her own behalf.

Father was provided opportunities to cross-examine each of Mother's witnesses, including Mother herself; he attempted cross-examination of L.C. and M.C. only.  While Father was able to ask L.C. and M.C. to clarify certain parts of their testimony, Father had to be reminded several times that he was only permitted to ask questions on cross-examination, and was not allowed to argue with the witnesses.  For example, the following exchange took place on cross-examination of L.C.:

17

BY [FATHER]:
Q.   [L.C.], you just said that it would be
(indiscernible) I'm not good father in terms of educating
and intensive (indiscernible) for my kids.  I believe that
I did my best, sending them in their doctors --

THE COURT:  Excuse me.  Do you have any questions for her?

Q. (BY [FATHER])  [L.C.], how did you said that -- you said
that I am not being a good father to my kids in terms of
their health or something or their school, in their school,
sending them in [] School?

A.    Well, I understand from your son, [Son], who is . . .
eight years old, that you do his homework for him, and you
provide him his answers because you felt that he was too
lazy to do his homework, and he was frustrated about doing
his homework.  I don't think that's a good thing for a
father to do because the son -- your son will never learn
anything in school.

Q.    I'm -- I'm trying to encourage him to do his homework
or to do his classwork.

THE COURT:  [Father], not time to argue with the witness.
If you have a question to ask her, you should ask her now.

[FATHER]:  (Through interpreter) Only the question -- only
statements that (indiscernible) make?
(In English) Only the statement, Your Honor, or --

THE COURT:  This is not the time for you to make
statements.  If you have questions to ask [L.C.]--

[FATHER]:  About what she said?

THE COURT:  About her testimony, yeah.

[FATHER]:  That's all, Your Honor.

Similarly, on M.C.'s cross-examination, the following

exchange took place:

BY [FATHER]:
Q.    Sir, [M.C.] Lieutenant, what did you said, N.C.,
North Carolina, is better than Hawaii, considering now
there's a lot of crime happening there, considering Hawaii
is very peaceful, and there's no history of anything
violence, except the last war, which is World War II, which
has been long, long time [sic]?

A.    [Father], for your information, working -- working
the streets of Kalihi for 29 years and the surrounding

18

district of Kaneohe, our town is not as peaceful as you
might imagine. I've been trained in riot control, and we
have prevented a few riots, including a few at a bar . . .
many times. So the actions that you've seen in Charlotte,
North Carolina, are typical of a . . . metropolitan area.
We're no different.

The metropolitan [area] here . . . has a permanent
population of 956,000 people. Of that, the average . . .
people who are committing crimes is 3 percent. Well,
that's over 30,000 who are causing trouble in our city. So
we don't live in a real peaceful environment[.]

Q. And then you said that the kids not going have a hard
time going back and forth every week. Have you ever think
that it's going to be hard for them not to see me, if
you're thinking the -- their best interest, to
(indiscernible) me as their father, not see me every week
(indiscernible) right now?

A. Considering my observations of their reactions to you,
oh, I certainly think they'll be much better off,
especially as a baby, when your daughter, [Daughter], used
to kick and scream when you'd take her away from her mother
or me or my wife during the twice weekly exchanges.

Q. For what I see, [M.C.], my daughter always excited to
see me, and my son.

THE COURT: Excuse me, [Father]. This is the time for
questions. Okay?

[FATHER]: That's all, Your Honor.

Then, during Mother's direct testimony, the following

exchange took place:

THE COURT: Now, are you asking the Court, as far as joint
legal custody is concerned, to give you any tie-breaking
authority if you move to North Carolina because you will be
there with the kids?

[MOTHER]: Yes, Your Honor. That's what was recommended in
the custodial evaluator's report. I would love to have the
tie-breaking, Your Honor.

THE COURT: Okay. I just wanted to clarify that.

After Mother finished presenting her evidence, the family

court informed the parties that it had asked the CIU social

worker to come up to court to be sworn as the court's witness

19

and to authenticate her CIU Report.  The family court observed that the CIU Report "does not appear to have been filed in court," and that the family court wanted to provide the parties an opportunity to ask the social worker any questions they had regarding the CIU Report.  Upon being informed that the CIU social worker was being called to testify, Father then orally requested a continuance to consult an attorney:

> [FATHER]:  Can I say something, Your Honor?  I would like to practice my right to -- to see a -- a lawyer.
>
> THE COURT:  See a lawyer now?
>
> [FATHER]:  I would like to extend this hearing.
>
> THE INTERPRETER:  Asking for a continuance because he wants to consult a lawyer.

Mother objected to Father's request for continuance, stating that she intended to enroll Son in school in North Carolina and the hearing on her motion for post-decree relief had already been continued several times.  The family court then asked Father why he had not retained an attorney up until this point.  Father responded:

> Your Honor, I didn't know is going -- this going to be the setup, 'cause normally when we go to . . . court, it's normally asking the judge.  I didn't know about . . . cross-examination, something like that.  I have no idea. So I would like to practice my right to hire a lawyer, to see a lawyer (indiscernible), and extend this hearing, 'cause I . . . have no idea about this . . . procedure.

The family court denied Father's motion for a continuance in the following exchange:

20

THE COURT: Okay. [Father], the problem I'm having is that this motion was filed back . . . in February. You folks have had numerous hearings before . . . Judge Kupau. Since that time, you've been to court, you know, a fair amount. I guess . . . I don't understand why you've had in excess of six months to hire an attorney, and now we're halfway through the trial, and you want to continue the matter to hire an attorney.

[FATHER]: Like, again, like I said, Your Honor, I didn't know this -- that this the first time I been here in this kind of setup of -- in the court. I normally go to a -- they get a judge and two of us.

THE COURT: Uh-huh.

[FATHER]: That's -- that's how it is. But cross-examination, I have no idea. That's why I cannot do it. So I would like to say -- I would like to practice my right to . . . see a lawyer so I can also (indiscernible) for me to deliver my -- my . . .

THE COURT: Okay. [Father], the Court's going to deny your motion for a continuance. I think it's too late. We're already in the trial. That's something that if you were . . . going to, you should have hired an attorney early on. So I'm going to deny your motion. It's too late.

The family court then called the CIU social worker to the stand. The social worker briefly testified that she had performed a custody evaluation for the present case, that she had prepared the CIU Report, that the signature on a document before her was her signature, that she had made certain recommendations to the court as a result of the investigation, and that her recommendations had not changed from the September 23, 2016 date of the Report.[8]

---

[8]    As indicated later, the family court considered the CIU Report, which was not marked as an exhibit and was not received in evidence. The CIU
(continued. . .)

21

Both parties were then given opportunities for cross-examination.  Mother indicated she had no questions.  Father again experienced difficulty and again requested a continuance so that he could consult a lawyer, which the family court denied:

> BY [FATHER]:
> Q.   In her report, you never said that I do have a one-bedroom house and all that . . . safety first, which is I -- I mention it -- mention to you four times.  If you remember, when you come to my house, my main goal for my . . . children is . . . their safety.  But . . . you never put anything about that, all that safety thing that I show it to you?
>
> A.   I'm sorry.  I don't understand the question.
>
> THE COURT:  [Father], it would help if you'd just ask a very simple question like, do you remember the time you visited my house?
>
> [FATHER]:  Like again -- like I said, Your Honor, I would like to see a lawyer because I would like to practice my right to -- 'cause I don't know -- I don't know how to do this thing.
>
> THE COURT:  Well, it's not hard, [Father].  If you're asking her about what she did or didn't see on a visit to your house, all you have to do is ask her, do you remember -- Do you remember visiting [Father's] house?
>
> THE WITNESS:  Yes.
>
> THE COURT:  What did the house look like?
>
> THE WITNESS:  It was a one-bedroom, one-bath, with a living room into an open kitchen area apartment.

---

(continued. . .)

social worker never testified as to the contents of the Report or her recommendations, except in response to the few questions asked by Father. The rules of evidence should be followed.

[FATHER]:  In her report, she didn't write down what inside of the refrigerator, things like that, what . . . foods that my children eat, and then what (indiscernible) my parent's house, and what the childrens do . . . there.  So to me --

THE COURT:  Okay.

[FATHER]:  -- this woman is incomplete.

THE COURT:  All right.

[FATHER]:  (Indiscernible.)

THE COURT:  Do you agree that your report is incomplete in any way?

THE WITNESS:  No.

THE COURT:  Okay.

[FATHER]:  Your Honor, again, I would like to practice my right to hire a lawyer, to . . .

THE COURT:  [Father], again, we're in the middle of the trial.  If you wanted to hire a lawyer, this was something you should have done way before this.

Do you have any other questions for [the social worker]?  Because if you don't, I'm going to release her.

[FATHER]:  That's all I want to ask (indiscernible).

After the CIU social worker left the stand, Father was given an opportunity to present his evidence.  Father elicited testimony from three witnesses.  Father also testified.  For the most part, Father testified in English, on his own; he relied on the Tagalog interpreter to clarify that he believed his children would experience anxiety if they relocated to Durham.  As he testified, Father went through his exhibits, explained their contents, and explained how each exhibit supported that moving to Durham was not in the children's best interests.

23

Mother and Father then gave their closing arguments.

Father's closing argument was as follows:

> [FATHER]:  Thank you, Your Honor. It's -- for me, it's more about the stability, that the kids will be there.  Over here in Hawaii, they are more stable. They already establish stability here. School, family, medical. Everything's -- everything that already is stable. Moving -- moving her in North Carolina is (indiscernible) especially --
>
> THE COURT:  It's what?
>
> [FATHER]:  Anxiety. (Through interpreter) Anxiety. (In English) Anxiety. (Through interpreter) Creates anxiety.
>
> THE COURT:  Anxiety for?
>
> [FATHER]:  For them, especially they're too young. I've been taking care of them -- my -- to them, except to my son, who has just came here, since his (sic) birth. So if they're going to be remove, Your Honor, that relationship is going to be different because they -- weekly we -- we always see each other, so it's going to be hard for both of us, for the -- for the -- for me and for my both children, that they enjoying, also, their family -- extended family here, which is their cousins, their uncle, the auntie, the grandparents. And, also, Your Honor, I've been a good father to them. I would like to continue that. They are my life. I will do more best for my kids. Last, Your Honor, I never do anything bad or a crime. I'm a good citizen. I deserve to have them. They are my life. They are my happiness. And then, also, Your Honor, it's not fair to me, as the petitioner or plaintiff in the very beginning, that I -- I going to -- I going to have only two months during the summer and from the – for . . . [MOTHER], having school year the whole year, which is ten months. Just change the -- the -- change the -- the situation. Have her the summertime, and I get the school year. Do you think it's going to be fair?
>
> THE COURT:  You should have asked that question of [MOTHER] on cross-examination. Okay. Anything else, [FATHER]?
>
> [FATHER]:  That's all, Your Honor.
>
> THE COURT:  Okay. Thank you very much.

At the conclusion of his closing argument, the following further exchange took place:

24

THE COURT: Okay. Thank you very much. The Court at this time is going to take the matter under advisement. I'm going to look over the exhibits that you folks have provided, and I'll render a decision within the next week. Okay? I want to thank both [FATHER] and [MOTHER] . . . . Thank you very much for your presentation and for your very professional -- your very professional demeanor. I appreciate it.

[FATHER]: I have a question, Your Honor. I'm sorry about every -- if this -- like I said in the very beginning, this is my first time to be in this kind of setup of -- in the court, 'cause normally the judge, me, and (indiscernible) or the lawyers. I don't know anything about cross-examination. That's why I just like, you know, what to do (indiscernible), I ask him many times. My question is, Your Honor, 'cause I feel that I need a lawyer, but you -- you deny it, just in case that you favor to her, I can always appeal? I practice my rights to -- to fight for my kids?

THE COURT: [FATHER], you can retain the services of an attorney anytime. But you can't do it in the middle of trial and expect the Court to continue, especially after [MOTHER] has put on her evidence already. So if you want to go out and retain an attorney to prosecute an appeal after the Court's decision, that's entirely up to you.

[FATHER]: I just ask (indiscernible).

THE COURT: As the Court, I can't give you legal advice. You need to retain your own attorney to do that.

[FATHER]: Yeah, I'm sorry about that, 'cause I didn't know this going to be the setup. That's why I don't know that -- you know, how to do this. If I -- if I knew it going to be like this, I probably hire a attorney, 'cause just considering that I have a interpreter, I don't know what –

THE COURT: Okay.

Although the family court had stated it would rule within the next week, the record does not reflect a ruling until almost two months after the September 30, 2016 trial. On November 23, 2016, the family court filed an "Order Granting Defendant's

25

Motion For Post-Decree Relief Filed February 1, 2016" ("the Order").[9] In the Order, the family court issued its factual findings based upon the CIU Report and the evidence presented at trial, and ruled with respect to legal and physical custody as follows:

> **2. LEGAL CUSTODY**. The Court has considered the criteria set forth in [HRS] §571-46(b) . . . with respect to each parent's request that the Court award them sole legal custody of the minor children. Particularly, the Court focused on subsections (3) through (9), (12), (15)[10]

---

[9]     As argued by Father in his motion for reconsideration, despite stating to the parties at the beginning of trial that it was not interested in the parties' past disputes and quarrels, apparently based on its review of the record, the family court discussed the previous post-decree motions in some detail, drawing negative inferences against Father, such as "Father's written response to Mother's Motion [to allow L.C. and M.C. to pick up the children] demonstrates an intense antipathy for, and hostility to, Mother because of events which occurred during their marriage; and a stated willingness to involve the minor children in disputes with Mother." In addition, as argued by Father in his motion for reconsideration, the family court might not have had been fully apprised regarding the details regarding this motion. In addition, however, the response negatively referred to by the family court was filed on July 18, 2013, within nine months after the divorce decree, and this matter took place more than three years later.

[10]    HRS § 571-46(b)(3) through (9), (12), and (15) provide:

> (b) In determining what constitutes the best interest of the child under this section, the court shall consider, but not be limited to, the following:
>
> . . .
> (3) The overall quality of the parent-child relationship;
> (4) The history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation;
> (5) Each parent's cooperation in developing and implementing a plan to meet the child's ongoing needs, interests, and schedule; provided that this factor shall not be considered in any case where the
> (continued. . .)

and (16)[11] as indicative of the best interests of the minor children . . . . The Court finds that Mother has carried her burden of proof, as set forth below.

As between the two parents, it is evident that Mother has been the more consistent parent in providing quality to her relationship with the children since the divorce. She has been the more attentive to the physical, emotional, safety and educational needs of the children. Mother has consistently demonstrated that she can separate the children's needs from her own, and place the best interests of the children over her own interests.

The Court also finds that Mother has demonstrated the occurrence of a change in circumstances necessitating a change in legal custody principally due to Father's inability or unwillingness to place the best interests of the children above his own disagreements and hostility towards Mother. [fn2 See § 571-46(b)(12), HRS.] Independent of any relocation decision, it is obvious that joint legal custody has not produced the desired benefits for the minor children, because of Father's behaviors. [fn3 The Divorce Decree requires that the parties attempt mediation of their disputes before filing motions in court. To date, there is

---

(continued. . .)

court has determined that family violence has been committed by a parent;
(6) The physical health needs of the child;
(7) The emotional needs of the child;
(8) The safety needs of the child;
(9) The educational needs of the child;
. . .
(12) Each parent's actions demonstrating that they separate the child's needs from the parent's needs;
. . .
(15) The areas and levels of conflict present within the family;
. . . .

[11]    HRS § 571-46(b)(16) requires consideration of "[a] parent's prior wilful misuse of the protection from abuse process under chapter 586 to gain a tactical advantage in any proceeding involving the custody determination of a minor" in the best interests analysis.

Despite the family court's reliance on HRS § 571-46(b)(16), there is no record of any HRS Chapter 586 proceedings involving Father and Mother.

no indication that the parties have attempted mediation.[12]] Father has placed the minor children at the center of his disputes with Mother; first, by calling HPD repeatedly at the pick up and drop off locations to document his frivolous allegations against Mother for custodial interference; and second, by refusing to communicate with Mother to resolve relatively insignificant issues relating to the pickup and drop off schedule. Moreover, Father's trial testimony demonstrates that he has no intention of cooperating and coparenting with Mother in the future; his fixation with "fighting for [his] children" with Mother instead of attempting to work with her for the children's benefit, demonstrates misplaced priorities. From the post-Decree history of the parents, the Court has no factual basis for inferring that Father's hostility towards Mother will lessen with time or distance. Mother has also carried her burden of showing that she has attempted to work with Father for the benefit of the children, albeit unsuccessfully.

For these reasons, the Court finds that the best interests of the minor children require a change in legal custody from joint legal custody to sole legal custody in favor of Mother. The Court further finds that the best interests of the children require that Mother be tasked the obligation to inform and confer with Father concerning the major issues of the minor children's lives. Father shall also have equal access to the children's medical and school records, as well as their extracurricular activities. If the parties cannot arrive at a consensus decision on the major issues of the children's lives, then Mother shall make the decision.[13]

**3. PHYSICAL CUSTODY/RELOCATION.** The Court finds that Mother has carried her burden of demonstrating that the best interests of the children support her request to relocate her residence with the children from Honolulu to

---

[12]     Father's alleged failure to refer matters to mediation was not raised by Mother and was never discussed during the trial, and as also argued by Father in his motion for reconsideration, may have been factually incorrect.

[13]     Mother's motion was based on her relocation request.  In addition, as noted, Mother repeatedly stated she was not requesting a change in legal custody.  Upon questioning by the family court, Mother indicated she wanted "tie-breaking" authority with respect to legal custody.  Yet, this portion of the family court's ruling, which changes legal custody from joint to solely to Mother, is not conditioned on any relocation, and orders a change not requested by Mother.

Durham, North Carolina, forthwith.[14] The Court also finds that Mother has carried her burden of demonstrating that the best interests of the children require an award of physical custody of the minor children to Mother.

Mother has demonstrated that the children's opportunities for education, medical care, employment and cultural growth in Durham, NC are better than Honolulu. Because the maternal grandparents will accompany Mother to Durham, Mother has shown that she has support for supervision, direction and care for the children, in addition to her husband. Mother has also shown that her opportunities for employment in the Durham area are more numerous and advantageous to her, than those in Honolulu.

The Court is not persuaded that the children should remain in Honolulu with Father. First, as noted above, Father's evident and continuing hostility to Mother, even after the divorce, and his willingness to place the children at the center of their disputes, cannot be in the children's best interests. Moreover, based on his behavior to date, the Court finds that Father is unable to place the children's best interests ahead of his own. Second, neither Father nor any of his witnesses at trial articulated any compelling reasons for the children to remain in Honolulu. Finally, Mother's plan for relocation adequately provides time for Father to visit with and enjoy time with the children.

In order to prevail on her request to change physical custody and to relocate with the minor children to Durham, North Carolina, Mother must demonstrate that: (1) "there occurred such a change in circumstances that the replacement of custody would be in for the best interests of the children", Dascoscos v. Dascoscos, 38 Haw. Terr.265, 266 (1948); and (2) that relocation of the minor children to Durham, North Carolina would be in the best interests of the children as enumerated in §571-46(b), HRS. Mother must demonstrate these elements to a preponderance of evidence.

Mother's proposed relocation of the minor children to Durham, North Carolina is a change in circumstances, the occurrence of which would dictate a change in physical custody, in the best interests of the children. Dascoscos, supra; quoted in Waldecker, supra at p. 22. The Divorce Decree clearly contemplated that the parties would share equal time with the minor children while they resided on the island of Oahu. While the Decree does refer to the possibility of relocation by one or both parties in §3, the provision requires that a relocating party give 60 days

---

[14]    Although the Order allows relocation "forthwith," the record does not indicate any ruling on the September 30, 2016 trial until this November 23, 2016 order.

29

> notice of the relocation to the other party, who may then consent or object. Nothing in the Decree governs time-sharing between the parties in the event that one relocates out of the State of Hawaii.
>      Based on the evidence at trial and the report of CIU, the Court finds that Mother has been the primary caregiver, and more consistently supportive parent to the children. The Court also finds that Mother has, and is presently able to place the interests of the children ahead of her own, even while working multiple jobs to provide for them financially. No evidence was presented at trial that any safety issues will arise if an award of physical custody is made to Mother for the relocation. On the other hand, Father has failed to show that he has advanced the children's educational opportunities [fn4 [L.C.] testified that Father, rather than supervising [Son's] homework, actually did the homework for [Son], which hindered [Son's] efforts at school.] nor has he demonstrated at trial that he would be an adequate physical custodian. Based upon these findings, the Court awards sole physical custody of the minor children to Mother, subject to Father's rights of visitation, as set forth below.

Additionally, in a footnote, the family court indicated that Father requested a continuance at trial, but that the request was denied:

> Father requested a continuance of the trial to retain legal counsel after Mother had concluded her presentation of evidence in her case in chief. Despite the passage of 7 months and numerous court hearings since the filing of Mother's Motion, Father had failed to seek or retain legal counsel. Father presented no excuse for his failure to retain legal counsel in a timely fashion, and the Court denied Father's request for a continuance literally in the middle of trial as untimely.

On December 2, 2016, Father filed a motion for reconsideration. In summary, Father argued that his motion should be granted because: (1) several of the family court's factual findings were erroneous or based upon incomplete information; (2) the evidence, in his view, demonstrated that relocation to Durham was not in the children's best interest;

30

and (3) the family court should have granted his motion for a continuance so he could have sought advice from a lawyer.[15]

On January 4, 2017, the family court issued a written order denying Father's motion for reconsideration. The family court ruled that Father's motion reiterated arguments he had raised at trial and did not present any new evidence and/or arguments that could not have been presented at trial.

## C.  ICA proceedings

On appeal, Father, now represented by counsel, raised two points of error. Father argued that the family court abused its discretion in denying his motion for a continuance at trial and in considering the CIU Report in support of its decision granting mother's motion for post-decree relief.

Regarding the first point of error, in summary, Father argued that the family court abused its discretion in denying his motion for a continuance because:  (1) a continuance would not have resulted in any inconvenience to the family court, the parties, or the witnesses; (2) Father had legitimate reasons to seek a continuance, given that "[h]e is not a native English speaker and had great difficulty communicating as he attempted

---

[15]    See also notes 9 & 12, supra.

cross-examination of the witnesses"; and (3) Father was not at fault for waiting to consult a lawyer for several months, as Father did not know he would need the assistance of counsel until shortly before trial because he was not given a copy of the CIU report until, at a maximum, a week before trial.

With respect to his second point of error, Father advanced several arguments in support of his position that the family court abused its discretion in considering the CIU Report. First, Father argued that the CIU report was deficient. Father highlighted that the CIU Report only "compared alternatives of MOTHER or FATHER having sole physical custody, without taking into account that these alternatives mean that MOTHER was prepared to abandon the children to FATHER if the motion were denied," and "failed to consider the advantages to the children of remaining in a stable and familiar environment in Hawai[ʻ]i within the jurisdiction of the Hawai[ʻ]i Family Court." Father also argued that the CIU Report was incomplete because it did not sufficiently investigate Stepfather's background and the details of the intended neighborhood of relocation. Father further argued that the family court abused its discretion in considering the CIU Report because the social worker was not qualified to serve as a custody evaluator under HRS § 571-46.4

(Supp. 2013), and Father did not consent to the social worker's appointment as a custody evaluator.

Mother, acting pro se, responded to each of Father's points of error. Mother first argued that the family court did not abuse its discretion in denying Father's mid-trial motion for a continuance. Mother argued that at the June 8, 2016 hearing, the family court had informed both of the parties that the next proceeding was going to be a trial. Additionally, Mother argued that at the September 30, 2016 hearing, prior to the parties' opening statements, the family court explained how the trial was going to proceed and provided the parties with an opportunity to ask questions. Mother contended that the family court correctly denied Father's motion for a continuance, as he had ample opportunity to seek counsel and to resolve any questions regarding the nature of trial proceedings, but still chose to represent himself.

With respect to the second point of error, Mother contended that the family court did not abuse its discretion in considering the CIU Report. Mother argued that HRS § 571-46(a)(4) does not require a parent to consent to an investigation or report, and asserted that the CIU social worker was qualified to serve as a custody evaluator under HRS § 571-46.4(a) (Supp. 2013). Mother also countered that the social

33

worker sufficiently investigated Stepfather by speaking with him over the phone twice and by speaking with his landlord/housemate over the phone. Mother concluded that the CIU Report was not only complete, but was thorough, accurate, and drafted by a qualified individual.

On December 26, 2017, the ICA filed a summary disposition order, in which a majority of the ICA panel vacated the family court's orders granting Mother's motion for post-decree relief and denying Father's motion for reconsideration. DJ v. CJ, CAAP-17-0000027, at 1-5 (App. Dec. 26, 2017) (SDO). The ICA majority concluded that "the family court abused its discretion in denying Father's request for a continuance to seek the assistance of counsel." DJ, SDO at 5. The ICA majority further determined that it need not address Father's second point of error. DJ, SDO at 2 n.1.

Judge Reifurth dissented. DJ, SDO at 6-12 (Reifurth, J., dissenting). In his view, the family court did not abuse its discretion in denying Father's request for a continuance. DJ, SDO at 6 (Reifurth, J., dissenting). He reasoned that because Father had been provided with an interpreter, Mother's motion had been filed more than seven months before the trial, and Father was familiar with his right to counsel and the process, yet chose not to hire an attorney, Father had not exercised due

34

diligence. Accordingly, Judge Reifurth would have ruled that father's substantive parental rights had not been infringed upon and the family court did not abuse its discretion in denying "Father's mid-hearing request for a further continuance." DJ, SDO at 10-11 (Reifurth, J., dissenting).

Judge Reifurth also addressed Father's second point of error. DJ, SDO at 11-12 (Reifurth, J., dissenting). He opined that Father did not demonstrate that: (1) the CIU Report was incomplete in any material sense; (2) the family court's ability to consider the CIU Report was conditioned upon his consent thereto; or (3) the family court relied upon the CIU report in granting Mother's motion for post-decree relief. DJ, SDO at 11 (Reifurth, J., dissenting). Based on the family court's "broad discretion in examining reports concerning a child's custody," Judge Reifurth opined that the family court did not abuse its discretion in considering the CIU Report. DJ, SDO at 11-12 (Reifurth, J., dissenting).

On February 8, 2018, the ICA entered its Amended Judgment on Appeal.

**D. Application for writ of certiorari**

Mother filed a timely application for a writ of certiorari, raising two questions: (1) whether the family court abused its discretion by denying Father's request for a continuance to

35

obtain legal counsel; and (2) whether the family court manifestly abused its discretion by relying upon a CIU Report that was alleged to be incomplete and performed without Father's consent.

For the reasons below, the ICA majority did not err in ruling that the family court abused its discretion by denying Father's request for continuance to obtain legal counsel. Based on its ruling on the first question, the ICA majority did not address the second question. As the second question on certiorari would still be at issue on remand, however, we address issues raised therein to provide guidance. Ultimately, we affirm the ICA's Amended Judgment on Appeal, as modified by this opinion.

### III.  Standards of Review

### A.   Whether an abuse of discretion occurred

A family court's decision to grant or deny a motion for a continuance is reviewed for an abuse of discretion. Onaka v. Onaka, 112 Hawai'i 374, 378, 146 P.3d 89, 93 (2006). "It is well established that '[a]n abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party-litigant.'" Id. (brackets in original, citation omitted).

36

Whether an abuse of discretion occurred is a question of law. In re B.G.D., 351 S.W.3d 131, 145 (Tex. Civ. App. 2011). Thus, an Intermediate Court of Appeals ruling that an abuse of discretion occurred is a question of law reviewed under the right/wrong standard of review.

## B. Consideration of evidence

> When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

State v. St. Clair, 101 Hawai'i 280, 286, 67 P.3d 779, 785 (2003) (citations omitted).

## IV. Discussion

## A. The ICA did not err in ruling that the family court abused its discretion in denying Father's motion for a continuance.

At issue is whether the ICA majority erred in ruling that the family court abused its discretion in denying Father's request for a continuance, in other words, whether the ICA erred in ruling that the family court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party-litigant. As we noted in AC v. AC, 134 Hawai'i 221, 233, 339 P.3d 719, 731 (2014):

> Important constitutional interests provide . . . reason for providing parents a full and fair opportunity to present their case in custody decisions. Indeed, a parent's right to the "care, custody and control" of his or her child is a fundamental liberty interest protected by the United States Constitution. Troxel v. Granville, 530 U.S.

> 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("[T]he interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by this Court."). This court has also recognized that independent of the United States Constitution "parents have a substantive liberty interest in the care, custody, and control of their children protected by the due process clause of article 1, section 5 of the Hawai'i Constitution.[1] Parental rights guaranteed under the Hawai'i Constitution would mean little if parents were deprived of the custody of their children without a fair hearing." In re Doe, 99 Hawai'i 522, 533, 57 P.3d 447, 458 (2002).

As reflected in the passage above, it is axiomatic that a parent's right to the care, custody, and control of the parent's child is a fundamental liberty interest protected by the United States and Hawai'i constitutions and entitled to due process protection.  In a child custody context, we have specifically stated that the State may not deprive a parent of the fundamental liberty interest in the care, custody, and control of a child

> *without providing a fair procedure for the deprivation.* Furthermore, the Supreme Court has said that parental rights cannot be denied without an opportunity for them to be heard at a *meaningful time and in a meaningful manner.*

In Re Doe, 108 Hawai'i 144, 157, 118 P.3d 54, 67 (2005) (emphasis in original).  In light of the important constitutional interest involved, the ICA majority did not err in ruling that the family court abused its discretion in denying Father's oral request for

a continuance to seek counsel under the circumstances of this case.[16]

This case involved Mother's motion to relocate to North Carolina with the children and their soon to be step-father, a potentially significant deprivation of Father's fundamental liberty interest in the care, custody, and control of his children.  The reality is that if the request for relocation was granted, even with an order allowing visitation during some school vacations, Father's future contact with his children would be significantly curtailed, especially due to the high cost of travel to and from Hawai'i.  Based on the possibility of such a significant curtailment of his fundamental liberty interest, Father was entitled not just to his "day in court,"

---

[16]    The dissent opines that because the family courts are uniquely positioned as triers of fact throughout complicated and emotional custody cases, we afford them "great deference" in making custody decisions and in determining what is in the best interests of the child.  The applicable standard of review is still "abuse of discretion."  But here, we are not even reviewing the merits of the actual custody or "best interests" decision, but rather, the family court's denial of Father's request for a continuance to seek counsel.

We also note that in In re Jane Doe, Born on May 22, 1976, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) which the dissent cites and which states that family courts have wide discretion in making decisions that will not be set aside without a manifest abuse of discretion, we actually held that the family court abused its discretion in denying a motion for new trial, which resulted in the exclusion of testimony inferentially bearing upon the best interests of a child.

but to be heard in a "meaningful manner." See AC, 134 Hawai'i at 232-34, 339 P.3d at 731-32 (finding an abuse of discretion in the family court's setting of a rigid time period for custody trial based on the important constitutional interest involved).

As the ICA majority noted and as the transcript passages in Section II(B) depict, "[t]he record indicates that Father was unfamiliar with the trial process, did not understand that trial would impose different requirements than prior hearings that he attended, and did not know how to conduct cross-examination. Father was also burdened with language difficulties as English was not his first language[.]" DJ, SDO at 2. As the ICA majority also emphasized, Father did not seek the continuance for a general delay, and Father's substantive parental rights were at stake at trial. DJ, SDO at 5. In addition, the continuances before September 30, 2016 were not due to dilatory tactics by Father.

In regard to Father not understanding that the September 30, 2016 trial would impose different requirements than prior court hearings, although Father had appeared at various "hearings," and although the family court referred to the initial setting on July 8, 2016 as a "trial," the written orders referred to the trial as an "extended hearing." It also appears that Father received some information regarding trial requirements because

40

he appeared with witnesses and exhibits.[17]  However, even if

Father had received some basic information regarding "extended

hearing" or "trial" requirements, as noted by the ICA majority

and as reflected in Section II(B), he clearly was unfamiliar

with cross-examination of witnesses at a trial, and had

difficulty understanding and expressing himself in English in a

case involving the fundamental and important constitutional

interest of the care, custody, and control of his children.

Significantly, it was when the family court stated it would

be calling the CIU social worker as its own witness that Father

requested a continuance to seek and retain counsel.  The family

court denied Father's request for a continuance on the grounds

that Mother's motion had initially been filed in February (about

seven months earlier), there had been numerous appearances

before Judge Kupau, and that, therefore, the request was "too

late."  As reflected in Section II(B), however, Father explained

that only he, Mother, and the judge had been present at past

hearings, and that he was unfamiliar with the trial process,

_____

[17]     If the family court provides written guidelines, pretrial orders, or
otherwise provides other information to pro se litigants regarding trial
requirements, the record would be enhanced by including this information.

41

including cross-examination.  In addition, as pointed out by the

ICA, and as reflected in Section II(B) above:

> [The record] further indicates that Father had not
> officially been served with the CIU report, which the
> family court introduced at the trial and on which the
> family court relied, and it is unclear when Father actually
> received the report.

DJ, SDO at 2.

As also noted by the ICA majority, the record does not

reflect that Father had been served with the September 23, 2016

CIU Report on or about that date.  Although it appears the

parties were in possession of the CIU Report during the trial,[18]

it is unclear whether this occurred on the day of or before the

September 30, 2016 trial date.  It was important to provide the

parties with sufficient time to review findings from a custody

study, as Judge Kupau had earlier noted at the March 30, 2016

hearing, to allow them to prepare for trial accordingly.

Although there had been previous appearances before Judge

Kupau, those appearances had occurred before preparation of the

CIU Report, which contained major recommendations adverse to

---

[18]    When Father attempted to cross-examine the CIU social worker, he tried
to point out that her report and investigation were incomplete because she
did not describe what types of food were in his refrigerator and what the
children were doing while they were at their paternal grandparent's house
during the home-visit, indicating that Father had read the CIU report by that
time.

Father.  In fact, it was not until September 14, 2016, nine days before the report, that the CIU social worker conducted a home visit and observation of Father with the children at Father's home.  Father's perception of the social worker's attitude toward him prompted his detailed letter to Judge Kupau on September 21, 2016.  The CIU report was dated September 23, 2016 and it is unclear whether Father received it before the September 30, 2016 date of trial.  Thus, even if Father had sought counsel immediately after receiving the report with findings adverse to him, he realistically did not have adequate time to retain and receive appropriate assistance from counsel before the September 30, 2016 trial date.

In other words, Father did not have seven months to obtain counsel, as implied by the family court, after receiving the adverse CIU Report.[19]  Father requested a continuance to seek counsel when the family court informed the parties that it would be calling the CIU social worker <u>as its own witness</u>.  Under the circumstances, the family court's ruling that "Father presented

---

[19]    For this reason, the California Court of Appeal cited by the dissent, <u>A.G. v. C.S.</u>, 246 Cal. App. 4th 1269 (Cal. Ct. App. 2016), is clearly distinguishable on its facts, as the mother in that case apparently had several months to seek counsel without any intervening event such as the CIU Report here.

no excuse for his failure to retain legal counsel in a timely fashion" is therefore erroneous.  In fact, Father's September 21, 2016 letter to the Judge Kupau should have alerted the family court that Father might need to seek counsel or at least need more time to gather evidence to respond to a twenty-eight page, single-spaced report that summarized the testimonies of numerous witnesses and implicated important constitutional interests. The family court could have exercised its discretion to ask Father on September 30th whether he needed more time to seek counsel or prepare evidence to respond to the Report instead of proceeding with trial.

Also, Father's right to be heard in a "meaningful manner" included his right to cross-examine the CIU social worker. Cross-examination is the "greatest legal engine ever invented for the discovery of truth."  California v. Green, 399 U.S. 149, 158 (1970) (citations omitted).  The importance of cross-examination is not limited to criminal cases.  As the United States Supreme Court stated in the context of a complex antitrust case,

> It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'

Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473 (1962).  We have also recognized the importance of allowing

cross-examination in the context of a civil proceeding affecting substantial rights.  See In re Waiola O Molokai, Inc., 103 Hawai'i 401, 443, 83 P.3d 664, 706 (2004) (finding error in refusal to permit cross-examination regarding limu population along shoreline with respect to protection of native Hawaiian traditional and customary gathering rights).

The importance of the right of cross-examination with respect to the CIU Report is explicitly recognized by the Legislature in HRS § 571-46(a)(4), which provides in relevant part that

> [w]henever good cause appears therefor, the court may require an investigation and report concerning the care, welfare, and custody of any minor child of the parties. When so directed by the court, investigators or professional personnel attached to or assisting the court, hereinafter referred to as child custody evaluators, shall make investigations and reports that shall be made available to all interested parties and counsel before hearing, and the reports may be received in evidence if no objection is made and, if objection is made, may be received in evidence; provided the person or persons responsible for the report are available for cross-examination as to any matter that has been investigated[.]

HRS § 571-46(a)(4) (emphasis added).  Yet, Father clearly did not understand how to exercise this right to cross-examination.

The concurrence and dissent ("dissent") states that Father did not identify what information he was prevented from eliciting on cross-examination.  We have recognized, however, that "the harm suffered by parents proceeding without counsel may not be readily apparent from the record, especially because

45

without the aid of counsel, it is unlikely that a case is 'adequately presented.'" In re T.M., 131 Hawai'i 419, 436, 319 P.3d 338, 355 (2014) (citing Lassiter v. Dep't of Soc. Servs. Of Durham Cnty., N.C., 452 U.S. 18, 51 (1981) (Blackmun, J., dissenting)).[20]  We have also recognized that "[c]ounsel often cannot know in advance what pertinent facts may be elicited on

---

[20]  The dissent contends that Father successfully gave opening and closing statements, presented his evidence, elicited testimony from his witnesses, and cross-examined Mother's witnesses, that he competently presented his case, and the family court's ruling merely avoided further unnecessary delay.  Not only do we disagree with this contention, as indicated by this quoted passage in In re T.M., when there is a deprivation of counsel, it is unclear what harm may have been suffered by a parent.

In addition, due process requires that "justice []not only be done but [] manifestly be seen to be done."  In re Estate of Damon, 119 Hawai'i 500, 509, 199 P.3d 89, 98 (2008).  The family court's reliance on previous post-decree motions to draw adverse inferences against Father appears unfair when the family court informed the parties at the commencement of trial that the past arguments were not relevant.  Also, the family court's reliance on Father's alleged failure to refer matters to mediation appears unfair when the issue was never raised or discussed, and when the family court may not have had the entire background.  Also, it does not appear just for the family court to have ended Father's legal custody when Mother repeatedly made it clear that she was not making such a request and the family court's questioning only suggested it was considering "tie-breaker" authority with respect to legal custody.  Counsel would have been able assist Father on these issues.

Moreover, in addition to the problems with cross-examination, Father was also told by the family court during his "closing argument" that he should have asked mother during cross-examination whether it would be fair for Father to only have the children during summer vacation, further indicating that Father did not understand the process.  The family court also incorrectly suggested to Father that he could retain counsel after the trial only for purposes of prosecuting an appeal, rather than for post-trial or other motions.  Counsel most probably could have been of assistance in Father's motion for reconsideration.

46

cross-examination."  State v. Maluia, 107 Hawai'i 20, 32, 108 P.3d 974, 986 (2005) (quoting Alford v. United States, 283 U.S. 687, 692 (1931)).  In any event, as contended by Father's appellate counsel, counsel could have not only argued applicable law, but could also have presented additional evidence, including conducting a much more rigorous cross-examination of the CIU social worker, to address various issues in the relocation decision.  For all of these reasons, we respectfully but strongly disagree with the dissent.

The family court denied Father's request for a continuance based solely on the grounds it had been made during trial and was "too late."  Due process concerns must prevail over court scheduling concerns.  Prejudice to Mother was not raised or cited as a reason for denying a continuance.[21]  Based on Father's constitutional interest in the care, custody, and control of his children, and for all of the reasons stated, the ICA majority did not err by holding that the family court abused its discretion

---

[21]    It appears Mother wished to move quickly to join Husband and start Son in a North Carolina school, but that by the time the family court ruled on November 23, 2016, it made more sense for Son to start at a new school after the winter break.  In any event, under the circumstances, Father should have been given a reasonable continuance to seek counsel.

in not granting Father's request for a continuance to seek the assistance of counsel.[22]

## B. The family court did not abuse its discretion in considering the CIU Report.

Because issues regarding the CIU Report may arise on remand, we address Mother's second question on certiorari.

Father argued that the family court erred in considering the CIU Report because he did not consent to a custody evaluation being performed by the family court's CIU and because the CIU social worker was not qualified to serve as a custody evaluator under HRS § 571-46.4. This is an evidentiary question of law reviewed under the right/wrong standard of review.

With respect to Father's alleged lack of consent to a custody evaluation by the family court's CIU, HRS § 571-46(a)(4) provides in relevant part as follows:[23]

> Whenever good cause appears therefor, the court may require an investigation and report concerning the care, welfare, and custody of any minor child of the parties. When so directed by the court, investigators or professional personnel attached to or assisting the court, hereinafter

---

[22] The family court should have procedures in place that allow all judges to set further trial dates when necessary to ensure protection of important constitutional interests, such as the care, custody, and control of children. Father should have been granted a reasonable continuance to seek the assistance of counsel, whether or not he ultimately was successful in doing so.

[23] There have been no changes to HRS § 571-46 since 2013.

> referred to as child custody evaluators, shall make
> investigations and reports that shall be made available to
> all interested parties and counsel before hearing, and the
> reports may be received in evidence if no objection is made
> and, if objection is made, may be received in evidence;
> provided the person or persons responsible for the report
> are available for cross-examination as to any matter that
> has been investigated[.]

As can be seen, HRS § 571-46(a)(4) does not require consent to a custody evaluation investigation and report before one can be ordered and considered by the family court. Father does not cite to any other authority supporting his contention that consent was a prerequisite to the family court's ability to consider the CIU Report. Therefore, Father's consent was not required.

Father also asserts that the CIU social worker was not qualified to conduct a child custody evaluation due to HRS § 571-46.4, which, in general, sets out licensing requirements for court-appointed custody evaluators and provides that the judiciary shall maintain a publicly accessible registry of child custody evaluators qualified pursuant to that section.[24] This is also a question of law reviewed under the right/wrong standard.

---

[24]    HRS § 571-46.4 provides;

> **Child custody evaluators; qualification; registry;
> complaints.**
>
> (continued. . .)

(continued. . .)

(a) A person may be appointed as a child custody evaluator for purposes of section 571-46 if the person is actively licensed as a:
     (1) Physician under chapter 453 and is a board certified psychiatrist or has completed a residency in psychiatry;
     (2) Psychologist under chapter 465;
     (3) Marriage and family therapist under chapter 451J; or
     (4) Clinical social worker under section 467E-7(3).
(b) A person may be appointed as a child custody evaluator in the absence of a license under subsection (a) if:
     (1) The individual has obtained education and training that meet nationally recognized competencies and standards of practice in child custody evaluation; provided that there are no child custody evaluators enumerated under subsection (a) who are willing and available, within a reasonable period of time, to perform child custody evaluations; or
     (2) The parties stipulate to a person who does not qualify as a child custody evaluator under subsection (a) and the court approves that person as a fact-finding investigator to the court.
(c) The judiciary shall maintain on its website a publicly accessible registry of child custody evaluators who are qualified pursuant to this section. Professionals who are willing and available to perform child custody evaluations shall be responsible for providing the judiciary with relevant information, including contact information, evidence of qualifications, and fees.
(d) The judiciary shall establish a referral process to allow parties to file a complaint with the judiciary regarding a court-appointed child custody evaluator. Upon notification by a party of the party's intent to file a complaint against a child custody evaluator appointed under subsection (a), the judiciary may refer the complainant to the appropriate licensing authority. The judiciary shall submit to the legislature an annual report regarding the number of complaints against court-appointed child custody evaluators that are processed through the referral process.
(e) A complaint against a court-appointed child custody evaluator not qualified under subsection (a) may be resolved through civil litigation.

HRS § 467E-6(2) (2013), however, exempts CIU social workers from the licensure requirements of HRS Chapter 467E.[25] Father's argument therefore lacks merit.

Mother also contests Father's argument that the family court abused its discretion in considering the CIU Report because the record is unclear as to whether Father had been officially served with a copy, and whether Father had actually received the report before trial. HRS § 571-46(a)(4) requires that "investigations and reports . . . be made available to all interested parties and counsel before [the] hearing[.]" As Father's counsel will have had ample time to review the CIU Report on remand, we need not address this issue. We agree,

---

[25] HRS § 467E-6 provides in relevant part that "[l]icensure shall not be required of . . . (2) Any person employed by a federal, state, or county government agency in a social worker position, but only at those times when that person is carrying out the duties and responsibilities as a social worker in governmental employment[.]"

Article VI, section 7 of the Constitution of the State of Hawai'i provides this court with the power to promulgate court rules relating to practice and procedure, which have the force and effect of law, including the Hawai'i Rules of Evidence. Admissibility of a CIU social worker's opinion regarding custody would be subject to the rules of evidence, including the rules regarding qualification as an expert.

In addition, the first sentence of HRS § 571-46.4 provides that a person may be appointed as a child custody evaluator "for purposes of section 571-46," and subsection (4) of HRS 571-46 in turn provides that "[w]here there is no child custody evaluator available that meets the requirements and standards . . . the court may appoint a person otherwise willing and available in accordance with section 571-46.4[,]" which also provides exceptions to the licensure requirement. See HRS § 571-46.4 quoted in note 25, supra. Such circumstances exist here. See Section II(B), supra.

however, that parties should be given adequate time to review and respond to a twenty-eight page, single-spaced report that summarizes the testimonies of numerous witnesses and implicates important constitutional interests.

Finally, Mother raises as an issue on certiorari and requests that this court address Father's contention that the family court abused its discretion in considering the CIU Report. Father had argued that the CIU Report was flawed and that its recommendation was suspect because it did not explicitly address all factors set forth in HRS § 571-46(b), and that it could have included additional information that would have helped the family court ascertain whether relocation was in the children's best interests.  Father's arguments in this regard go to the weight to be given the report, not to its admissibility.  See City & Cty. of Honolulu v. Bonded Inv. Co., 54 Haw. 385, 390-91, 507 P.2d 1084, 1089 (1973) ("The fact that an expert witness omits consideration of one element of many in arriving at [an] opinion . . . goes to the weight of [the expert's] testimony rather than to the admissibility of [the expert's] opinion.").

The CIU Report addresses nearly all of the factors that the family court is required to consider in determining the best

interests of the children pursuant to HRS § 571-46(b).[26]  Thus,

Father's argument that the CIU report is flawed because it fails

---

[26]    HRS § 571-46(b) provides:

> (b) In determining what constitutes the best interest of the child under this section, the court shall consider, but not be limited to, the following:
>
>> (1) Any history of sexual or physical abuse of a child by a parent;
>> (2) Any history of neglect or emotional abuse of a child by a parent;
>> (3) The overall quality of the parent-child relationship;
>> (4) The history of caregiving or parenting by each parent prior and subsequent to a marital or other type of separation;
>> (5) Each parent's cooperation in developing and implementing a plan to meet the child's ongoing needs, interests, and schedule; provided that this factor shall not be considered in any case where the court has determined that family violence has been committed by a parent;
>> (6) The physical health needs of the child;
>> (7) The emotional needs of the child;
>> (8) The safety needs of the child;
>> (9) The educational needs of the child;
>> (10) The child's need for relationships with siblings;
>> (11) Each parent's actions demonstrating that they allow the child to maintain family connections through family events and activities; provided that this factor shall not be considered in any case where the court has determined that family violence has been committed by a parent;
>> (12) Each parent's actions demonstrating that they separate the child's needs from the parent's needs;
>> (13) Any evidence of past or current drug or alcohol abuse by a parent;
>> (14) The mental health of each parent;
>> (15) The areas and levels of conflict present within the family; and
>> (16) A parent's prior wilful misuse of the protection from abuse process under chapter 586 to gain a tactical advantage in any proceeding involving the custody determination of a minor.  Such wilful misuse
>>                              (continued. . .)

to address all requirements governing a family court's custody decision lacks merit.

## C. Based on the effect an out-of-state relocation has on parental and children's rights, a family court should consider available resources in reviewing a relocation request

This case highlights one of the difficult decisions addressed by family court judges in this state—whether to allow one parent to relocate out-of-state with a child. Such decisions implicate the rights of parents as well as the rights of children.

With respect to parental interests, we have recognized the importance of procedural safeguards in protecting parental liberty interests in the care, custody, and control of children.

___

(continued. . .)

> may be considered only if it is established by clear and convincing evidence, and if it is further found by clear and convincing evidence that in the particular family circumstance the wilful misuse tends to show that, in the future, the parent who engaged in the wilful misuse will not be able to cooperate successfully with the other parent in their shared responsibilities for the child. The court shall articulate findings of fact whenever relying upon this factor as part of its determination of the best interests of the child. For the purposes of this section, when taken alone, the voluntary dismissal of a petition for protection from abuse shall not be treated as prima facie evidence that a wilful misuse of the protection from abuse process has occurred.

The CIU Report itself is sealed due to its confidentiality pursuant to HRS § 571-84(c). See note 5, supra.

In Doe, we held that parents in need of an interpreter because of an inability to understand English are entitled to the assistance of one at any family court hearing in which their parental rights are substantially affected.  Doe, 99 Hawai'i at 526, 57 P.3d at 451.  Then in T.M., we recognized that "[i]nherent in the substantive liberty interest that parents have in the care, custody, and control of their children under the Hawai'i Constitution is the right to counsel to prevent erroneous deprivation of their parental interests."  131 Hawai'i at 434, 319 P.3d at 353.  We held that in light of the constitutionally protected liberty interest at stake in a termination of parental rights proceeding, indigent parents must be guaranteed the right to court-appointed counsel in termination of parental rights proceedings under the due process clause of the Hawai'i Constitution.  131 Hawai'i at 436, 319 P.3d at 355.[27]

---

[27]     In so holding, we recognized that, as Justice Stevens discussed in Lassiter, a state's decision to deprive a parent of a child is often "more grievous" than a state's decision to incarcerate a criminal defendant. Lassiter, 452 U.S. at 59 (Stevens, J., dissenting).  We further pointed out that, as explained by Justice Blackmun, a parent in termination proceedings may struggle with legal issues that are "neither simple nor easily defined," and with a standard that is "imprecise and open to the subjective values of the judge."  T.M., 131 Hawai'i at 435, 319 P.3d at 354, (citing Lassiter, 452 U.S. at 45) (majority opinion).

The main populated Hawaiian Islands are some of the most remote land masses in the world, located about 2,400 miles from California and 4,000 miles from Japan.  When a child relocates out-of-state with the other parent, even if a court order allows for visitation during summer or winter vacations, travel expenses make regular continued contact with the child quite difficult, if not impossible, for the great majority of Hawai'i parents.  Even if a parent can afford travel expenses, a child's relocation out-of-state substantially affects the rights of a custodial parent.  As in this case, the prospect of children relocating out-of-state can be extremely difficult for a parent.

When one parent requests permission to relocate out-of-state with a child, however, under Hawai'i law, the governing consideration is not a parent's interests, but whether allowing relocation is in the "best interests of the child."  See HRS § 571-46(a)(1);[28] see also Fisher v. Fisher, 111 Hawai'i 41, 50, 137

---

[28]   HRS § 571-46(a)(1) provides in general as follows:

> **Criteria and procedure in awarding custody and visitation; best interest of the child.**
>
> (a)  In actions for divorce, separation, annulment, separate maintenance, or any other proceeding where there is at issue a dispute as to the custody of a minor child, the court, during the pendency of the action, at the final hearing, or any time during the minority of the child, may
>
> (continued. . .)

P.3d 355, 364 (2006). In Fisher, we discussed our precedent as well as approaches of other states in relocation cases, and reaffirmed that the "best interests of the child" standard, which provides a family court with "broad discretion to weigh the various factors involved," also governs relocation cases. Fisher, 111 Hawai'i at 50, 137 P.3d at 364.

A proposed out-of-state relocation with a child undoubtedly raises difficult questions regarding what is actually in a child's "best interests."[29] In addition, a family court's "best interests" determination also implicates a child's rights to parental contact. See HRS § 576-46(b)(7); see also Sweet v. Passno, 206 A.D.2d 639, 640 (N.Y. App. Div. 1994) (recognizing

_____

(continued. . .)

> make an order for the custody of the minor child as may seem necessary or proper. In awarding the custody, the court shall be guided by the following standards, considerations, and procedures:
>
> (1) Custody should be awarded to either parent or to both parents according to the best interests of the child, and the court also may consider frequent, continuing, and meaningful contact of each parent with the child unless the court finds that a parent is unable to act in the best interest of the child[.]

[29] HRS § 571-46(b), quoted in note 26, supra, sets out a non-exhaustive list of factors a court is to consider in determining best interests, but the factors are not geared toward relocation decisions.

child's right to maintain a meaningful and nurturing relationship with parent).

Therefore, an out-of-state relocation affects a parent's substantive liberty interest in the care, custody, and control of a child, but is governed by a child's best interests, which includes a child's right to parental contact. In making these difficult determinations regarding whether or not to allow relocation, family courts should consider CIU or any other available family court social worker reports. Family courts also have the discretion to appoint guardians ad litem for children in relocation cases pursuant to HRS § 571-46(a)(8).[30] This case, however, also illustrates the importance of family courts providing parties with sufficient time to review and respond to custody recommendations in order to comport with procedural due process.

---

[30]     HRS § 571-46(a)(8) provides:

> The court may appoint a guardian ad litem to represent the interest of the child and may assess the reasonable fees and expenses of the guardian ad litem as costs of the action, payable in whole or in part by either or both parties as the circumstances may justify[.]

## V.   Conclusion

Based on the reasons above, the ICA's February 8, 2018 Amended Judgment on Appeal remanding this case to the family court is affirmed.   The family court is to conduct further proceedings consistent with this opinion.

| | |
|---|---|
| Blake T. Okimoto,<br>for petitioner | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| Rebecca A. Copeland,<br>for respondent | /s/ Michael D. Wilson |

